Filed 10/25/2019

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C077666 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F2037) |
| v. | |
| DOLORES MARIA LUCERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Shasta County, Cara Beatty, Judge. Affirmed.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Supervising Deputy Attorney General, and Marcia A. Fay, Deputy Attorney General, for Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts III, IV, V, VI, VIII, IX and X.

1

This case of first impression involves the application of Penal Code section 134,[1] preparing false evidence. At issue are declarations containing false information collected by defendant, Dolores Maria Lucero, to be used in court to support of her request for injunctive relief to halt a petition drive to recall her from her position as a city council member for the City of Shasta Lake (Shasta Lake). Defendant also submitted the declarations to law enforcement, and an investigation against a person involved in the recall effort was initiated as a result. Defendant duped several people who had signed the recall petition into signing these declarations. A jury convicted defendant of violating section 134 for this conduct. She was thereafter placed on probation for three years with various terms and conditions including that she serve 30 days in jail. Two years into her probation, defendant petitioned for early termination of probation and the court granted it.

On appeal, defendant contends that: (1) section 134 was inapplicable to the circumstances of this case and that section 118, perjury, is a more specific statute that covers her conduct; (2) there was insufficient evidence to support the conviction; (3) the trial court committed prejudicial instructional error related to the instructions on the charged offense; (4) the testimony of one of the declarants, Charles Lukens, was coerced and that the trial court erred in excluding evidence offered to show that Lukens had a motive to conform his testimony to the prosecution's theory of the case; and (5) certain probation conditions must be struck because they are unreasonable.

We affirm.

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution's Evidence

**Circulation of the Recall Petition**

Kay Kobe was one of the leaders of the recall effort and served as treasurer of the recall committee. Pamelyn Morgan, a Shasta Lake city council person and mayor of the city, testified that she was also involved with the petition to recall defendant. Morgan knew Kobe as a friend and worked with Kobe on the recall effort. Morgan circulated petitions for the recall effort. On some occasions, Kobe would be with her.

**Defendant Reports Alleged Elections Code Violations to Law Enforcement**

Defendant reported alleged Elections Code violations to Tom Bosenko, Sheriff of Shasta County, claiming that a petition was being solicited illegally by Kobe who did not live in Shasta Lake. Although defendant was with an attorney, defendant did "close to . . . 95 percent" of the talking. Sergeant Eric Magrini was assigned to investigate and defendant gave him five signed declarations. Magrini did not ask who prepared the typed declarations. Copies of the five declarations were introduced into evidence as People's exhibits 2-A through 2-E. Defendant told Magrini that she had filed a lawsuit seeking an injunction to prevent the recall from appearing on the ballot and had obtained the declarations to invalidate some of the signatures.[2]

Defendant repeated to Magrini that Kobe had circulated the recall petitions and had gathered signatures for the recall. Magrini could not recall whether defendant told

---

[2] Each declaration bore the following caption and footer: "Declaration of _____ in support of plaintiffs' *ex parte* application for temporary restraining order and order to show cause re preliminary injunction; Application for order shortening re preliminary injunction." (Capitalization omitted.) In support of an application for a temporary restraining order, an attorney representing defendant filed a declaration in which he stated: "Based on declarations by several other persons, and on information and belief, I believe that the Recall Proponents have improperly collected signatures in their attempt to put a recall measure on the ballot."

him that Kobe had been circulating the petitions while alone, but this allegation appeared in each of the declarations. Magrini testified at the preliminary hearing that defendant asserted during this first interview that Kobe "was participating in collecting the signatures which, according to the Elections Code, . . . she is not allowed to because it only allows residents of . . . Shasta Lake who are registered voters to collect the signatures that go on the recall petitions. . . ."

Magrini ran Kobe's DMV record and determined that she did not live in Shasta Lake. Based on Magrini's understanding of Elections Code section 11045 at that time, he believed that Kobe was not allowed to circulate recall petitions in Shasta Lake. As we discuss *post*, after further investigation, he arrived at a different conclusion.

**Declarant Charles Lukens**

Charles Lukens, a resident of Shasta Lake, testified that, in late November 2011, two or possibly three people came to his residence circulating a petition to recall defendant. Lukens did not know any of the people circulating the petition, although he may have recognized the name Kay Kobe. When shown a photograph of Kobe, Lukens testified that she was one of the people. Lukens did not know the others. Lukens signed the petition.

Sometime after Lukens signed the recall petition, defendant came to Lukens's house. Defendant told Lukens that Kobe was not a resident of Shasta Lake, and that she was not permitted to have people sign the recall petition. Defendant did not take a statement from Lukens, and he did not give her information about what he knew about the recall. Thereafter, defendant came to Lukens's house a second time. Lukens believed that, on this second occasion, defendant came to his residence "about . . . signing some paper or something." Defendant spent approximately 15 to 20 minutes talking to Lukens before she presented him with a prepared declaration. The document was pre-typed with some blank lines for information to be filled in. Lukens testified that defendant explained the declaration was about Kobe not being a resident and that it was

4

illegal for her to pass out the petition. Defendant told him he needed to sign the document and write in his address and how long he had been a Shasta Lake resident.

Lukens identified the signature on the declaration marked as People's exhibit 2-A and other handwritten entries as his. He believed that exhibit 2-A was the document that he filled out when defendant came to his residence on this last occasion. He told the jury that all the handwriting was his except the word "November." Defendant told him to fill in his address and she would fill in the date.

People's exhibit 2-A read in pertinent part: "1. I am a resident and registered voter of the City of Shasta Lake, California ('Shasta Lake'). I have been a resident of Shasta Lake since 32 years.[3] [¶] 2. I am over the age of eighteen (18) and I have personal knowledge of each and every fact stated herein and, if called to testify as a witness, I could and would testify competently thereto under oath. [¶] 3. This Declaration is submitted with full knowledge that it will be used in support of Shasta Lake Citizens for Justice and Dolores Lucero's Application for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction, which seeks to stop the currently schedule [*sic*] April 10, 2012 recall election of Councilmember Dolores Lucero ('Councilmember Lucero'). [¶] 4. I am familiar with the facts and circumstances surrounding the movement to institute a recall election for City Councilmember Lucero, but I am personally politically neutral on the issue. [¶] 5. *I am familiar with the individual known as Kay Kobe, who is a resident of Redding*, California, and a member of the Gateway School Board. [¶] 6. On November, 2011, at approximately 3 p.m., Kay

---

**3** "32 years" was handwritten on a line provided for the duration of residency. This field was handwritten on each of the other declarations as well. With the exception of the number of years the declarant had resided in Shasta Lake, the first three paragraphs in each declaration are the same. In setting forth the contents of each of the remaining declarations, we will omit the years of residency and other material not pertinent to the issues before us.

Kobe approached me at my private residence . . . .[4]  She was circulating a petition for the recall of Councilmember Lucero.  *There were no other persons with her circulating the petition.  She asked by [sic] if I would sign such petition.  I declined.*"  (Italics added.)

Lukens testified that a number of statements in the declaration were true. However, the statement that he was familiar with Kobe was not true.  Lukens testified, "I'm not really familiar with her, and that whole point what she was saying was that it was -- that she wasn't a resident, so that's untrue right there."  Lukens also testified that he only knew Kobe was a Redding resident because defendant told him as much. Additionally, the statement that Lukens knew Kobe was a member of the Gateway School Board was false.

Lukens further testified that the statement in the declaration that there was no one else with Kobe when she was circulating the recall petition was false.  He testified that a woman who was with Kobe presented him with the petition, explained the petition or where to sign it, and he signed it.  Lukens testified that he told defendant "that there was other people there with Ms. Kobe . . . ."[5]

Additionally, the statement in the declaration that Lukens declined to sign the recall petition was false.  Lukens told defendant that he signed it.

Lukens testified that he did not read the entire declaration before signing it.  He explained that he had been tired, "a little hazy," from working a double shift.  When asked on direct examination if he read it before signing, Lukens responded, "No, I didn't. I – it was just explained the document, and it wasn't the smartest thing I did.  It was just I

---

**4**  "November" and "3" were handwritten on blank lines for the date and time.  This field was also handwritten on each of the other declarations.  Lukens's home address was also handwritten, but we omit that information here, as we do with each subsequent declaration.

**5**  On cross-examination, Lukens acknowledged that he testified at the preliminary hearing that he had not told defendant there was another person with Kobe.

just went off of her word, what she told me." When asked on cross-examination if, since the document was a declaration, he thought it was important to read it before he signed, Lukens responded, "To be honest, I should have read it. Uhm, what was explained to me and what's on the paper was two different things. So, I went off of – I made the mistake of going off of just what somebody said instead of reading it." Lukens acknowledged that defendant did not tell him *not* to read the declaration, and he did not tell defendant he was not reading the declaration.

**Declarant Cheri Ala**

Cheri Ala testified that, in November 2011, two people came to her house about a petition to recall defendant. Ala subsequently learned that Kobe was one of the two. The other was an older male named John with two prosthetic legs, who had been wearing shorts. Both talked to Ala, and she did not remember which of the two asked her to sign the petition, but she signed it.

Not too long after Ala signed the recall petition, Ala spoke to defendant after a city council meeting. Ala told defendant that she had seen Kobe on the news saying that she did not circulate the petition, and Ala told defendant that was not true because Kobe came to her house. Ala told defendant she wanted to have her name removed from the petition. Defendant asked Ala if there had been anyone with Kobe, and Ala stated that there had been a man with Kobe who had two prosthetic legs. Defendant asked if the man had been wearing shorts.

Defendant furnished Ala with a pre-typed document. Ala signed it. Presented with People's exhibit 2-B at trial, Ala identified her signature and handwritten entries, and testified that it appeared to be the document that she filled out and signed with defendant at the city council meeting. Ala testified defendant told her "where to fill in what." Regarding the time she signed the petition, defendant told Ala to put down the approximate time.

7

People's exhibit 2-B, read in pertinent part: "2. I have personal knowledge of each and every fact stated herein . . . . 3. This Declaration is submitted with full knowledge that it will be used in support of Shasta Lake Citizens for Justice and Dolores Lucero's Application for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction, which seeks to stop the currently schedule [*sic*] April 10, 2012 recall election of Councilmember Dolores Lucero ('Councilmember Lucero'). [¶] 4. I am familiar with the facts and circumstances surrounding the movement to institute a recall election for City Councilmember Lucero, but am politically neutral on the issue. [¶] 5. I am personally familiar with the individual known as Kay Kobe. [¶] 6. On approx [illegible], 2011, at approximately 4 p.m., Kay Kobe approached me at my private residence . . . . She was circulating a petition. *There were no other persons with her circulating the petition.* She asked by [*sic*] if I would sign the petition. [¶] 7. *I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero.* [¶] 8. I do not want my name to be counted as a voter in support of such petition and request to be removed from such petition." (Italics added.) Ala testified that the statement in the declaration stating that she had personal knowledge of all of the facts therein was false because she did not read the document. Additionally, the statement in the declaration concerning her knowledge of the purpose for the declaration was also false. Ala testified, "I didn't read it. I thought . . . [defendant] told me the declaration was about something totally different." Initially, Ala testified that defendant told her that the document was to stop the recall because the person circulating the petition did not live in Shasta Lake. Defendant told Ala it was to prove Kobe circulated the petition. Later, on cross-examination, Ala testified defendant told her the declaration was to have Ala's name removed from the petition. Ala testified that, "I thought at the time Kay Kobe was lying about circulating the petition." Ala thought by signing the declaration, she "was doing the right thing . . . ."

8

Ala testified that she had only met Kobe once, on the day she came to Ala's house, and the statement that she was personally familiar with Kobe was false.

Ala told the jury that the statement indicating that there were no other people with Kobe circulating the petition was false because "[t]here were two people there and [defendant] knew it." Asked how defendant would know this, Ala testified, "[w]e discussed it before I signed the document."

The statement in the declaration, "I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero," was also a false statement because the petition Ala signed was for the recall, and Ala testified that she was not misled about that. Nor did she tell defendant that Kobe misled her when she signed the recall petition.

Ala described the atmosphere at the council meeting where she signed the declaration as "crazy," like no other council meeting she had seen before. She felt hurried because the environment was hostile, a reporter was trying to talk to her because she had told the city council Kobe had lied on television about not circulating the petition, and members of the audience were also angry at her. According to Ala, the process of filling in the blanks on the declaration "went really fast" and "[i]t was all in a hurry." Ala testified, "I just did what she asked." Ala told the jury defendant "tricked me into signing something I didn't read and told me it was for something else."

**Declarant Betty Kirk**

Betty Kirk testified that, in November 2011, Kobe and another person came to her home concerning a petition to recall defendant. Kirk knew Kobe, but not the other person. Kirk signed the petition.

Later the same day, defendant and her friend came to Kirk's home. They were at Kirk's house for approximately an hour talking about why people were trying to get her removed from office. Defendant presented Kirk with a pre-typed document to sign, and Kirk filled in the blanks and signed it. When asked if someone explained what to do

9

concerning the blanks, Kirk testified defendant told her "to sign here and put that date, sign here." Kirk did not read the entire document. When asked why she signed the document without reading it, Kirk said she did so because she and defendant had gone over it and defendant had read it to her. Kirk testified that she trusted defendant and felt bad for her.

When shown People's exhibit 2-D, Kirk testified that it looked like the document she reviewed and signed with defendant. People's exhibit 2-D read in pertinent part: "5. I am personally familiar with the individual known as Kay Kobe. [¶] 6. On Nov, 2011, at approximately 5:30 p.m., Kay Kobe approached me at my private residence . . . . She was circulating a petition. *There were no other persons with her circulating the petition.* She asked by [*sic*] if I would sign the petition. [¶] 7. *I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero.* [¶] 8. I do not want my name to be counted as a voter in support of such petition and request to be removed from such petition." (Italics added.)

Kirk testified that the statement in the declaration that there were no other persons with Kobe circulating the petition was false. Kirk testified that she told defendant that there was someone else with Kobe when Kobe approached her. In fact, together they tried to figure out who the other woman was. Kirk also testified that it was not Kobe, but rather the person who was with Kobe, who asked her to sign the petition. Kirk testified, "It was the one that was with her was telling what the -- what it was about." Kirk also testified that, contrary to the statement in the declaration, she knew she was signing the petition to recall defendant. Kirk testified that she never told defendant that she did not know what Kobe gave her to sign, and, in fact, she told defendant that she knew what she signed. Kirk did agree, however, that, when she signed the declaration, she no longer wanted her name counted as a voter in support of the recall petition. She felt she had signed the petition without knowing enough about the issues.

10

Kirk testified that she only had the declaration for a brief time and did not read it. She testified that defendant went over the declaration with her. Kirk did not read the entire declaration because she trusted defendant. On cross-examination, Kirk acknowledged that defendant never told her *not* to read the declaration.

**Declarant Deloris Arnold**

Deloris Arnold testified that, in November 2011, she was at a neighbor's house when two people she did not know came by with a petition to recall defendant. When shown a photograph of Kobe, Arnold testified that Kobe may have been one of the two individuals. The other individual was a male. Arnold signed the recall petition.

Approximately two weeks later, defendant came to Arnold's house with another person. Arnold had not previously met defendant. She spoke with defendant for approximately 20 minutes. They discussed the recall effort. Defendant told Arnold that "she [defendant] was in the right."

A couple of days later, defendant returned to Arnold's house to have Arnold sign a document. Arnold did not read the document before signing it because she did not have her glasses. She asked defendant what the document was and defendant simply said her lawyer wanted her to sign it. Arnold asked, "what for?" Defendant said, "Well, it just needs to be signed." On this occasion, Arnold did not fill in any information; she only signed after defendant told her where to sign. Arnold explained, "I didn't have my glasses on, but I went ahead and signed it, because I -- I just wanted to find out the truth." Asked why she signed a document that she did not read, Arnold testified, "I just believed her," referring to defendant.

Arnold testified that defendant returned the following day and had her sign another document. Arnold asked why she needed to sign it since she had "just signed one yesterday." Defendant said, "My lawyer wants you to go ahead and sign this." Arnold asked, "But why?" Defendant said, "Well, you just – you need to sign this," so Arnold signed. Arnold "took it in good faith that everything was okay." Again, she did not have

11

her glasses on and she signed the document without reading it.  However, Arnold did not tell defendant she could not read without her glasses.

When shown People's exhibit 2-C, Arnold testified that the handwriting on the document was hers.  People's exhibit 2-C states in pertinent part:  "2.  I have personal knowledge of each and every fact stated herein . . . .  [¶]  3.  This Declaration is submitted with full knowledge that it will be used in support of Shasta Lake Citizens for Justice and Dolores Lucero's Application for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction, which seeks to stop the currently schedule [*sic*] April 10, 2012 recall election of Councilmember Dolores Lucero ('Councilmember Lucero'). [¶] . . . [¶]  5.  I am personally familiar with the individual known as Kay Kobe.  [¶]  6. On 11-20, 2011, at approximately [illegible] p.m., Kay Kobe approached me at my private residence . . . .  She was circulating a petition.  *There were no other persons with her circulating the petition.*  She asked by [*sic*] if I would sign the petition.  [¶]  7.  *I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero.*  [¶]  8.  I do not want my name to be counted as a voter in support of such petition and request to be removed from such petition."  (Italics added.)

Arnold testified that, contrary to the statement in the declaration, she did not have personal knowledge of each and every fact therein.  She also did not have full knowledge of the purposes for which the declaration was to be used.  Arnold testified that defendant said that she was going to use the document in an effort to keep her position on the board of supervisors.[6]  Arnold also testified that the statement in the declaration that she was personally familiar with Kobe was false.  Arnold further testified that the statement that Kobe came to her house on a particular date at a particular time circulating a petition was false, because Kobe "never came to [her] house."  Also, the statement that there was no

---

[6]  As earlier noted, defendant was a member of the Shasta Lake City Council.

one else with Kobe when she was circulating the petition was also false. Arnold reiterated that two people approached her at her neighbor's house, asking her to sign the petition. Arnold knew what she was signing and she never told defendant that, when she signed the recall petition, she did not know what it was. Arnold also never said that she wanted her name off of the recall petition.

On cross-examination, Arnold acknowledged that when she testified at the preliminary hearing, she testified that she asked the people circulating the petition what it was about and they did not explain it to her. She explained they "didn't go into detail." Arnold also acknowledged that defendant did not tell her *not* to read the declaration.

**Declarant John Nelson**

John Nelson did not testify, but Karen Marks, his caretaker, did. Marks testified that, in November 2011, Nelson was blind, and he was "beginning to descend into dementia." He would change the thread of a conversation in midstream and could not follow a conversation to its conclusion.

Marks recalled an occasion in November 2011, when two people came to Nelson's house with a petition to recall defendant. Marks testified that she "helped [Nelson] sign their petition."

Morgan testified that on one of the occasions Kobe accompanied her, they went to the home of a blind man whom she later learned was John Nelson. There was a caretaker present. Morgan testified that Kobe "may have done most of the talking." However, it was Morgan who circulated the petition.

Within two weeks, defendant came to Nelson's house. Marks testified she did not know whether Nelson signed anything for defendant. However, Marks was certain that the signature on People's exhibit 2-E was Nelson's signature, which she recognized based on her experience in helping him sign documents. Marks was working in another part of the house and did not know whether defendant read the declaration to Nelson.

13

Marks did not believe that she read the document, but testified that she did read the text surrounding the blanks to Nelson so he would know what to fill in. Then she filled in the blanks with the information Nelson orally provided.

People's exhibit 2-E read, in pertinent part: "5. I am personally familiar with the individual known as Kay Kobe, who is a resident of Redding California, and a member of the Gateway School Board. In addition to the meeting described below, I have met Kay Kobe on ___ number of occasions, making her easily recognizable to me. [¶] 6. On 11/29, 2011, at approximately 3 p.m., Kay Kobe approached me at my private residence . . . . She was circulating a petition for the recall of Councilmember Lucero. *There were no other persons with her circulating the petition. She asked by [sic] if I would sign such petition. I declined.*" (Italics added.)

**Defendant's Declaration**

A declaration signed by defendant on February 29, 2012, was introduced by the prosecution and stated, in part: "5. I am familiar with the facts and circumstances surrounding the movement to institute a recall election against me. [¶] 6. I am personally familiar with the individual known as Kay Kobe, who is a resident of Redding California, and a member of the Gateway School Board. In addition to the meeting described below, I have met Kay Kobe on 1 [*sic*] number of occasions, making her easily recognizable to me. [¶] 7. On Nov 29, 2011, at approximately 3-4:00 p.m., I observed Kay Kobe approach a private residence . . . .[7] I was located in my vehicle located directly across the street at the location of Main Street. [¶] 8. I had a clear line of sight to observe Kobe approach such residence and the interaction she had with the resident of such property. I later discovered the identity of such person as John S. Nelson which I contacted Mr. Nelson at the above private residence in February 2012 regarding Kobe

---

**7** The address set forth for this private residence was John Nelson's address.

14

approaching him.  [¶]  9.  On the date *Kobe approached Mr. Nelson, [she] appeared to be holding a document in her hand.  During this time there were no other persons with her circulating the petition*.  [¶]  10.  Based on my observation of Kobe approaching others in . . . Shasta Lake, and my knowledge that Kobe was directly involved in the committee supporting the recall efforts against me, I believed that Kobe was circulating a petition to put a recall against me on the ballot.  [¶]  11.  *I observed Kobe approach Mr. Nelson, produce a piece of paper believed to be the recall petition, some discussion between Kobe and Nelson, and Kobe assisting Nelson in signing the document.  [¶]  12.  I then observed Kobe leave the vicinity of Nelson's residence and proceed walking South bound on Main Street.*  [¶]  13.  On or about January 23, 2012, I approached Mr. Nelson at his residence and inquired as to whether he recalled Kobe approaching him for his signature to a petition.  He recalled such occurrence.  He recalled that he signed a petition circulated by Kobe.  *He also advised that he was aware that Kobe was alone at such time.*  [¶]  14.  Attached as Exhibit A to this declaration is a printout of voter registration data which I purchased from Shasta County.  Such data shows in relevant part that . . . the residence address utilized by Kay Kobe for purposes of voter registration is . . . Redding, California."  (Italics added.)

**Sgt. Magrini's Investigation and His Follow-up Interview with Defendant**

Magrini met with each of the five declarants.  He also met with Kobe.  On March 16, 2012, Magrini interviewed defendant at her home.  The interview was audio-recorded and the recording was played for the jury.

In the interview, Magrini told defendant that he went over each declaration with the declarants line by line.  Magrini stated that each of the declarants told him that Kobe had someone else with her.  Magrini also stated that each declarant told him that the statement in their declaration that Kobe told them the petition was not for the recall of defendant was false, and that they knew they were signing the recall petition.

15

Magrini also told defendant that he had interviewed Kobe and that Elections Code section 11045 did not prohibit Kobe from "going door to door, from being part of the campaign for the recall." It only prohibited someone who is not a registered voter in the electoral jurisdiction from "acting alone, going and collecting signatures" unaccompanied by someone from the jurisdiction. Magrini told defendant, "So use a hypothetical. [My partner] and I are . . . circulating these recall petitions. He lives in City of Shasta Lake, I live in City of Redding. We can go together door to door. I can say whatever I want as long as he's there to witness the signature as a resident of the City of Shasta Lake. I cannot go by myself and collect signatures by myself as a resident of the City of Redding. So, there's no doubt Miss Kobe went out and helped petition and helped seek people to gather signatures. But every time she went she was with somebody by the statements provided by the five people . . . ."

Magrini told defendant that Kobe and the five declarants all said that, when Kobe went out collecting signatures, Kobe had someone else with her and it was the people she was with who gathered the signatures. He also told defendant that Kirk and Nelson reported that they knew what they were signing when they signed the recall petition.

Magrini specifically told defendant that, after he read Nelson the declaration, Nelson indicated that its contents were "not his understanding and that he was not familiar with that document. Partially because he couldn't see it, but the way it was explained to him by yourself that he didn't have all the information . . . when he signed the document" and that "you didn't fully explain it to him." Defendant said Nelson's caretaker read "the whole thing" to Nelson "and explained to him what it was."

Defendant claimed that she went through Arnold's declaration line by line with Arnold to verify each point. Magrini told defendant that Arnold said she did not have her glasses and essentially told him that defendant had deceived her or misrepresented when she signed the declaration.

16

Magrini told defendant that Lukens said the declaration was wrong and defendant did not explain the declaration to him when she asked him to sign. Magrini explained that Lukens told him, "I'm furious with Miss Lucero right now. I feel like I was misled."

Magrini told defendant that he believed that "where this investigation is leading . . . I believe that there was some manipulation." He told defendant, "I think there's some games being played here and some manipulation on how documents were presented." Magrini explained that he was continuing to investigate Kobe's alleged Elections Code violations, which he had found no evidence to support. However, he further explained, "I do have evidence to support is [*sic*] you coming into our office and making a false police report." Magrini stated that he would submit his report to the district attorney's office.

Defendant stated she had obtained a private investigator because, "I actually don't feel this is gonna come out fair. [T]his is bogus. This is bunch of bologna that these people are becoming cowards to, from what I see, they're not coming to be straight and saying the truth." Defendant stated that she knew "there was gonna be a turnaround and say something like that."

Defendant went on to say it seemed like the declarants were backing out because they were afraid. She asserted, "I'm telling the truth and I'm not gonna be taking people's lies and how these turning out because . . . this whole thing started with these people." She insisted, "I always tell people you need to read the document to make sure . . . you understand what you're signing."

Magrini emphasized that every declarant stated that Kobe had been with someone else, and that defendant specifically asked about that when she talked to them. The following exchange ensued:

17

"[MAGRINI]: Can we answer that question first? Did you specifically ask that and verify it? Cause that's the, the filing the criminal report that you made, the direct violation is her acting alone. Without anybody, a representative of the res, [*sic*] of the city, within the City of Shasta Lake with them, with her. Um, and it's very specific on each of these declarations. Line 18, there were no other persons with her circulating the petition. Period. That's very specific. It's been on every single document. And they signed these. And that's not true. And I think we knew that was the case but it was tried, we tried to slip it in.

"[DEFENDANT]: Well I mean,

"[MAGRINI]: That's my belief.

"[DEFENDANT]: You're, so the way I think,

"[MAGRINI]: Am I fair, am I fair in that?

"[DEFENDANT]: I understand that part. But it's, I mean I'm,

"[MAGRINI]: Can we answer that part? Am I fair in saying that?

"[DEFENDANT]: You're fair."

Defendant went on to say, "what I'm understanding too is that when you go door to door, like when me and her go door to door she goes to one, one side and I go to the other side. [¶] . . . [¶] So basically she might have been with somebody but doesn't mean they were together door to door." Defendant said what Magrini had described sounded like a "loophole."

Magrini repeated that none of the declarants were saying Kobe was by herself when they signed the petition. Defendant's response was to ask "what about" Arnold and Kirk?

Magrini explained that his investigation was "pretty much complete" and he would be turning it in. Defendant replied, "You're saying now you're gonna turn it around and basically make me to be the one who filed the wrong . . . information." Magrini confirmed that and defendant said, "that's what I kinda figured. That's why I called a . . . private investigator." Referring to Kobe, defendant told Magrini, "So in other words she is part of the same old good old boys." When Magrini said it was not appropriate to mislead people to sign documents to help support her cause, defendant responded, "I do not do that. And I wouldn't do it. [¶] . . . [¶] that's not the way it happened."

## Defense Evidence

Judy Harlson testified that, in November 2011, two people came to her house registering people to vote. Harlson signed a form. The two people were a husband and wife who lived down the road from her. The person who had Harlson sign the form did not mention defendant and did not mention a recall election. Defense counsel showed Harlson defense exhibit D, which was a petition to recall defendant. Harlson identified her signature on the petition. Pamelyn Morgan was named as the petition circulator. Harlson testified that she signed the form in order to register to vote, and for no other purpose. On cross-examination, Harlson testified that she did not believe that she reviewed the document before signing it.

The defense called Kobe, who testified that, at least for the last 20 years, she had not been a resident of Shasta Lake, although she had a chiropractic practice there. Kobe testified that she was the treasurer of the committee seeking the recall of defendant.

Kobe testified that she went door-to-door with another person, helping to collect signatures for the recall, and that sometimes she did so with Morgan. She also acknowledged that she would sometimes hold the clipboard, she would sometimes be the person to ask for a signature, and she would sometimes explain the petition. Kobe also

19

acknowledged that sometimes she would do most of the talking when she went out with Morgan.

On cross-examination by the prosecutor, Kobe testified that, when she went door-to-door collecting signatures, she always went with another person. Kobe testified that she always went with someone else because the law required that a registered voter be circulator of the petition, and she was not a registered voter in Shasta Lake.

Cathy Darling Allen was the Shasta County Clerk and Registrar of Voters. Allen acknowledged that the Elections Code did not give a definition of "circulator." It only references the qualification to be circulator, namely that the person has to be a resident and registered voter of the electoral jurisdiction. Allen testified that the handbook of the Secretary of State, discussing the procedures for recalling state and local officials, stated in parenthesis after the word circulator, "the person soliciting the signatures." Allen further testified that the local handbook contained a similar description of a circulator.

When asked on direct examination, whether she was aware of "any law . . . that says the person soliciting the signatures is no longer the circulator if they go around with a resident of the jurisdiction," Allen responded, "I don't believe there's any code that directly addresses that situation, that I'm aware of." When asked on cross-examination whether there was anything prohibiting a person from Shasta Lake from being accompanied by a nonresident going door-to-door trying to get people to sign a recall petition for a Shasta Lake councilmember, Allen testified, "Not that I'm aware of." When asked if "the nonresident speaks to the person at the door that they're trying to get to sign the petition," "[i]s there anything prohibiting that?" Allen responded, "I don't think there's anything that I'm aware of in the code that addresses any of this." Nor was Allen aware of anything in the code addressing how much the nonresident could speak. However, Allen said the person soliciting the signatures would be the circulator.

Allen testified that if someone who signed a recall petition complained to her in writing that only one person came to their door with the petition and that person was a

20

nonresident, they would have the right to have their name withdrawn before the petition was filed. If this information came to light after the petition was filed, the only recourse would be in court.

## Motions, Verdict, and Sentencing

Defense counsel moved pursuant to section 1118.1 for judgment of acquittal. The trial court denied the motion, finding that there was sufficient evidence for the matter to proceed to the jury. The jury found defendant guilty of preparing false documentary evidence (§ 134).

Defendant moved for a new trial, asserting that the verdict was contrary to the law and evidence because there was no evidence of anything false being prepared so as to support a conviction under section 134, and that the jury was misinstructed in several respects. The trial court denied defendant's motion.

The trial court placed defendant on formal probation for three years with terms and conditions discussed in the unpublished part of this opinion, *post*.

## DISCUSSION

### I. Prosecution for a Violation of Section 134

### A. Defendant's Contentions

Defendant asserts that a declaration containing a false statement is not a "false or ante-dated book, paper, record, instrument in writing, or other matter or thing" within the meaning of section 134. Defendant supports this contention with three arguments. First, according to defendant, section 134 applies only to "real evidence, not evidence (like a declaration signed under penalty of perjury) that is testimonial in nature." Second, a document containing untruthful witness testimony does not qualify as "false" within the meaning of section 134 because the term "false" as used in that section "means not genuine or inauthentic rather than untruthful in content." In this regard, defendant asserts that a "document containing written testimony would be considered false only if the document itself has been forged or altered so that it fails to accurately reflect the

21

testimony or the witness." Third, the Legislature has expressed its intent that a perjurious declaration should be prosecuted as perjury, not as a violation of section 134. Because, according to defendant, a false statement in a declaration is governed by a specific statute, section 118, which defines perjury, prosecution under a more general statute, such as section 134, is prohibited.

We disagree with all three arguments.

## B. Principles of Statutory Construction and Section 134

" 'Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.] The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.] If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes. [Citation.]' [Citation.] ' "Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute . . . ; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." [Citations.]' [Citation.] If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy." (*People v. Arias* (2008) 45 Cal.4th 169, 177 (*Arias*).)

" 'In California, there is no rule of strict construction of penal statutes. Such statutes are to be construed " . . . according to the fair import of their terms, with a view to effect [their] objects and to promote justice." [Citations.] A statute is to be given a reasonable and common sense construction in accordance with its apparent purpose and the intent of the Legislature—one that is practical rather than technical and that will lead to a wise policy rather than to mischief or an absurdity [citation]. The legislative intent

should be gathered from the whole statute rather than from isolated parts or words.  All of the parts should be construed together if possible without doing violence to the language or spirit of the statute.' "  (*People v. Bamberg* (2009) 175 Cal.App.4th 618, 627 (*Bamberg*), quoting *People v. Fields* (1980) 105 Cal.App.3d 341, 343-344 (*Fields*).)

Section 134 provides:  "Every person guilty of preparing any false or antedated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of felony."[8]

### C.  Analysis

#### 1.  "Book, Paper, Record, Instrument in Writing, or Other Matter or Thing"

Defendant offers a number of definitions of "instrument" and "instrument in writing," and argues that an instrument in writing within the meaning of section 134, as intended by the drafters of that section, "referred to formal documents that gave rise to 'contract, obligation or liability,' but not mere letters or memoranda."  However, we need not decide the meaning of "instrument in writing" in this case.  We are satisfied that a declaration can constitute a "paper," as well as any "other matter or thing."

Defendant asserts that "paper" does not refer to the physical material on which something is written or printed, and further asserts that a " 'paper' upon which something is written cannot be 'false.' "  Additionally, defendant asserts that paper as that term is used in section 134 necessarily means " 'valuable paper,' such as negotiable paper, commercial paper or chattel paper."  However, other than relying on two doctrines of construction, discussed *post*, defendant cites no support for her proffered definition of

---

**8**  Section 134 was enacted in 1872, and has never been amended.  (§ 134; *Bamberg, supra*, 175 Cal.App.4th at p. 629, fn. 4.)  There is no legislative history shedding light on the intent of the Legislature in enacting section 134.  (*Bamberg*, at p. 629, fn. 4.)

"paper," and we can find none.  Indeed, neither the chapter in which section 134 appears[9] nor the Penal Code as a whole sets forth a definition of the term "paper" limiting it in the manner advocated by defendant.  However, the plain meaning of the term "paper" includes:  "any piece of paper containing writing or print (as a letter or memorandum)." (Merriam-Webster Unabridged Dict. <http://unabridged.merriam-webster.com/unabridged/paper> [as of Sept. 26, 2019], archived at: https://perma.cc/4UJ5-7GRS.)  A dictionary source defendant relies upon for another term includes among its definitions of paper:  "a written or printed document or the like." (Dictionary.com <https://www.dictionary.com/browse/paper> [as of Sept. 26, 2019], archived at:  https://perma.cc/T5AT-MR75 >.)  The first definition of "paper" in Black's Law Dictionary, another source upon which defendant relies for the definition of another term, includes:  "Any written or printed document or instrument."  (Black's Law Dict. (10th ed. 2014) p. 1285, col. 1.)  By these definitions, a "paper" under section 134 would include the declarations at issue here.

Furthermore, the catch-all phrase in section 134, "or other *matter* or *thing*" encompasses a greater range of materials than those terms preceding it.  (Italics added.) We conclude that the catch-all, too, would include the declarations at issue here. Defendant asserts that a written declaration contains testimony, testimony is "information," and false testimony is a "concept" rather than a "false *thing*."  We discuss whether the declarations can be deemed false, *post*.  Here, we have no difficulty determining that these declarations qualify as "other matter or thing[s]."  Not only is a declaration clearly a "thing," but statements contained therein constitute "other matter." The plain meaning of the word "matter" includes:  "something that is to be proved (as in

---

**9** Section 136 sets forth the definitions of three terms used in the chapter for which section 134 appears, but does not include definitions of "paper" or any of the other terms used in section 134.

24

a court of law),” “a reason or the grounds for something,” “something written or printed or to be printed,” “a subject (as a fact, an event or course of events, or a circumstance, situation, or question) of interest or relevance,” and “something that is a subject of disagreement . . . or litigation.” (Merriam-Webster Unabridged Dict. <http://unabridged.merriam-webster.com/unabridged/matter> [as of Sept. 26, 2019], archived at: < https://perma.cc/Z9NU-93BE >.) A dictionary source defendant cites for other definitions includes among its definitions of matter: “a situation,” “something of consequence,” “ground, reason, or cause,” “things put down in words, especially printed,” and, in law, “statement or allegation.” (Dictionary.com <https://www.dictionary.com/browse/matter > [as of Sept. 26, 2019], archived at: https://perma.cc/8CWL-AA7H.) Black’s Law Dictionary defines “matter” as “[a] subject under consideration, esp. involving a dispute or litigation,” “[s]omething that is to be tried or proved; an allegation forming the basis of a claim or defense” and “[a]ny physical or tangible expression of a thought.” (Black’s Law Dict. (10th ed. 2014) p. 1126, col. 1.) The content of the declarations at issue here describes a situation, namely the circumstances under which the declarants signed the recall petition; consisted of statements and allegations; and the events described therein were something of consequence to be considered as purported grounds or reasons supporting defendant’s attempt to halt the recall through litigation. Thus, the declarations fit any one of these definitions of “matter.”

Defendant has not attempted to define “matter.” In our view, the definition of matter in section 134 is consistent with the use of that term in the perjury statute, section 118, which focuses on “material matter” the witness or declarant knows to be false.[10]

---

[10] Section 118, subdivision (a), provides, in pertinent part: “Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of

25

That language was in the perjury statute when it was enacted in 1872, the same year as the Legislature enacted section 134. (Ann. Pen. Code (1st ed. 1872, Haymond & Burch, comrs.-annotators) § 118, p. 58.) California's hearsay statute also uses the term matter. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth *of the matter* stated." (Evid. Code, § 1200, italics added.) Clearly, the definition of "matter" includes information or allegations in statements such as those in the subject declarations. (See *People v. Hill* (1980) 103 Cal.App.3d 525, 533, fn. 4 ["It is a generally accepted tenet of statutory construction that the same words used in different statutes that are in pari materia are to be given the same meaning"].)

Defendant relies primarily on two canons of statutory construction, *ejusdem generis* and *noscitur a sociis*. *Ejusdem generis* means ' " 'of the same kind' " ' (*Arias, supra*, 45 Cal.4th at p. 180), and provides that, "when a particular class of things modifies general words, those general words are construed as applying only to things of the same nature or class as those enumerated. [Citation.] This canon of statutory construction . . . ' "applies whether the specific words follow general words in a statute or vice versa. In either event, the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' " ' " (*Ibid*.)

*Noscitur a sociis* means " 'a word takes meaning from the company it keeps.' " (*People v. Hernandez* (2017) 10 Cal.App.5th 192, 200.) Under this rule, " ' "[a] word of uncertain meaning may be known from its associates and its meaning 'enlarged or restrained by reference to the object of the whole clause in which it is used.' [Citation.]"

the State of California be administered, willfully and contrary to the oath, states as true *any material matter* which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true *any material matter* which he or she knows to be false, is guilty of perjury." (Italics added.)

[Citation.]' [Citation.] ' " 'In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list.' " ' " (*Ibid*.)

Defendant asserts that these rules of construction limit the meaning of "other matter or thing" to things that are akin to books, papers, records, and instruments in writing. Defendant's reliance on these rules here is misplaced because these rules do not apply to restrict the plain meaning of words and are to be employed only when there is ambiguity.

In *Fields, supra*, 105 Cal.App.3d 341, the Court of Appeal addressed language in section 135, an evidence concealment statute, which contains the same language as section 134. At the relevant time, section 135 provided: "Every person who, knowing that *any book, paper, record, instrument in writing, or other matter or thing*, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor." (Former § 135, italics added.) "The precise question" raised in *Fields* was "whether [section 135] applies to the destruction of contraband (marijuana) by a jail inmate for the purpose of preventing the contraband from being used as evidence in a future criminal proceeding." (*Fields*, at p. 343.) The *Fields* court held that section 135 applied. (*Fields*, at p. 343.) In so doing, the *Fields* court was called upon to construe the italicized language from section 135, which is mirrored in section 134. The defendant asserted that section 135 contemplated only writings, and, in support of his argument, advanced the doctrines of *ejusdem generis* and *noscitur a sociis* as does defendant here. *(Fields,* at p. 344.)

The *Fields* court stated: "While these maxims indeed support appellant's interpretation, they are merely extrinsic aids to interpretation and are to be used only when the clear meaning of the words used in the statute is doubtful; such aids may not be

used to create doubts or offset the plain meaning of the statutes [citation]. In the present case, application of the maxims would unduly restrict the phrase 'other matter or thing' to less than its fair import and commonly understood meaning." (*Fields, supra*, 105 Cal.App.3d at p. 344; see *People v. Dyer* (2002) 95 Cal.App.4th 448, 455, italics added [principle of *ejusdem generis* "aids in the construction of a statute *if there is ambiguity*"; the principle has no application where the statutory language "is unambiguous and the catchall provision is expressly intended to be broader than the categories enumerated above it"].) The *Fields* court, construing the same language we are called upon to interpret here, stated: "We . . . construe the phrase, '*other matter or thing*' to encompass *an unending variety of physical objects* such as the green leafy material and handrolled cigarettes in the case at bench." (*Fields*, at p. 345, italics added.)

Defendant asserts that the *Fields* court improperly restricted these statutory construction doctrines, and, with regard to *ejusdem generis*, notes that, in reference to criminal statutes, the doctrine is to be applied with stringency. Defendant asserts that our high court's declaration that the maxim of *ejusdem generis* is to be applied with stringency "means that the rule is strictly applied in criminal cases." According to defendant, to "the extent *Fields* suggests otherwise, it conflicts with California Supreme Court authority and cannot be followed." Our high court has indeed stated that, " '[i]n construing criminal statutes the *ejusdem generis* rule of construction is applied with stringency.' " (*Arias, supra*, 45 Cal.4th at p. 181, quoting *People v. Thomas* (1945) 25 Cal.2d 880, 899.) But this does not mean we are to ignore the plain meaning of such terms as "or other matter or thing."

Even assuming that we agreed with defendant's position, we do not violate *ejusdem generis* by including the declarations within the scope of the catch-all phrase that follows the other specified items. The declarations come within the scope of the catch-all phrase as evidentiary documents such as the preceding listed items. Because, in this sense, the catch-all phrase would be construed as "applying . . . to things of the same

28

nature or class as those enumerated" (*Arias, supra*, 45 Cal.4th at p. 180), our interpretation would not violate the canon of *ejusdem generis*. Nevertheless, section 134 has been applied to cover items other than written documents. As we discuss in more detail in connection with defendant's falsity argument, courts have found section 134 applicable to photographs (*Bamberg*, *supra*, 175 Cal.App.4th 618) and a urine sample (*People v. Morrison* (2011) 191 Cal.App.4th 1551 (*Morrison*).)

Defendant also asserts that "any false or ante-dated book, paper, record, instrument in writing, or other matter or thing" in section 134 only refers to "real evidence" which she distinguishes from evidence that is testimonial in nature. Thus, according to defendant, because the preceding, listed items in the statute are all "real evidence," so too must be those items encompassed in the catch-all phrase.[11]

Section 134 is unambiguous and there is no language therein expressly limiting section 134 in the manner advocated by defendant. The statute simply does not differentiate between real and testimonial evidence. Moreover, in our research, we have not discovered any case stating that section 134 applies only to "real evidence" or that it does not apply to evidence in the form of statements in a declaration. By its terms, section 134 criminalizes preparing false evidence. The declarations here provided false evidence.

Defendant asserts that, if the Legislature intended section 134 to include "any writing" as coming within the ambit of section 134, it knew how to do so. Defendant relies on subdivision (a)(5) of section 550, which contains language criminalizing

---

[11] One definition of "real evidence" is "any tangible thing that is *itself at issue* in the case." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶ 8:431, p. 8C-47.) Similarly, Wharton describes real evidence as "items that played an actual part in the incident that is the subject of the prosecution." (3 Wharton's Criminal Evidence § 16:1 (15th ed.).) "Testimonial evidence" may be defined, for present purposes, as "[a] person's testimony offered to prove the truth of the matter asserted." (Black's Law Dict. (10th ed. 2014) p. 678, col. 2.)

insurance fraud carried out in "any writing."  In this regard, defendant relies on the

" 'settled rule of statutory construction that where a statute, with reference to one subject

contains a given provision, the omission of such provision from a similar statute

concerning *a related subject* is significant to show that a different legislative intent

existed with reference to the different statutes.' " (*In re Jennings* (2004) 34 Cal.4th 254,

273, quoting *People v. Norwood* (1972) 26 Cal.App.3d 148, 156, italics added.)  The

insurance fraud provisions do not involve a related subject.  Those provisions prohibit

false information presented to insurance companies and health care providers to

fraudulently obtain insurance payments for loss, injury, and damage, and health care

benefits.  Moreover, the insurance fraud provisions on which defendant relies as

establishing that the Legislature in 1872 knew how to specify "any writing" if it intended

to do so were enacted decades after the enactment of section 134.  (See § 550, added by

Stats. 1992, ch. 675, § 8; former Ins. Code, § 556, enacted 1935.)  Furthermore, it seems

clear that there was no reason to specify "any writing" in section 134 when the

Legislature instead included a broader term — "other matter or thing" — which in turn

could include, among other things, any writings.

Section 134 "must . . . be construed to effectuate the purpose of the law." (*People

v. Clark* (1977) 72 Cal.App.3d 80, 84.)  As the court in *Bamberg* noted, "[t]he objective

of section 134 is 'to prevent the fraudulent introduction of material in a proceeding under

the authority of law.' [Citation.]  Considered in its entirety, the statute serves to prohibit

attempts to perpetrate fraud in a legal proceeding by preparing evidence with the intent to

mislead or deceive the trier of fact.  Interpreting section 134 to cover [defendant's]

conduct serves the purpose of the statute." (*Bamberg*, *supra*, 175 Cal.App.4th at p. 629.)

Likewise, here, we conclude that our interpretation of section 134 as including the

declarations at issue effectuates the purpose of the law.

## 2. "False" Within the Meaning of Section 134

Defendant asserts that, even if the declarations could be deemed to come within section 134, "an untruthful statement contained within a declaration does not make the document false, within the meaning of" section 134. According to defendant, "[a] document containing written testimony would be considered false only if the document itself has been forged or altered so that it fails to accurately reflect the testimony or the witness." Defendant asserts that, to be false under section 134, the document must be "fake, forged, or counterfeit," and the documents at issue here are true and genuine because they were "genuine declarations that each declarant signed, and the writing truly reflected the written testimony of each declarant." Responding to the People's assertion that the declarations were false because they were made to deceive, defendant asserts that there was no deceit "or deception as to the nature of each document. Each written declaration was exactly what it purported to be, *i.e.*, the declaration of the declarant who signed it. Whether or not the testimony contained in the declaration was false does not effect [*sic*] the genuineness of the document itself. If the written declaration produced in court is the actual document that the witness signed, the *declaration* itself is true and genuine, regardless of the truth or falsity of the testimony that is represented therein." In addressing this contention, we find guidance in several cases where evidence was deemed "false" within the meaning of section 134.

In *Bamberg*, which was discussed extensively by the parties in the trial court, the defendant appeared in traffic court contesting a traffic citation he received for failure to stop at a stop sign. (*Bamberg, supra*, 175 Cal.App.4th at p. 621.) The defendant offered in evidence photographs to support his claim that there was no stop sign at the intersection, but several of the photographs actually depicted a different intersection. (*Ibid.*) A jury subsequently found the defendant guilty of, among other things, a violation of section 134 for submitting the photographs to the traffic court. (*Bamberg*, at p. 621.) On appeal, the defendant's sole contention was that the photographs were not "false"

31

within the meaning of section 134 because "they accurately depict[ed] the location where they were taken." (*Bamberg*, at p. 626.) The defendant asserted that it was his testimony that the photographs depicted the intersection where he was stopped that was false, not the photographs themselves. (*Ibid*.) The Court of Appeal rejected that argument and affirmed. (*Id*. at pp. 621, 630.)

The *Bamberg* court observed that the "question of whether under section 134 a matter or thing must itself be false—i.e., must be false on its face, without regard to what anyone may say about it—appears to be an issue of first impression." (*Bamberg, supra*, 175 Cal.App.4th at p. 626.) The court noted that the language of section 134 did not require that the matter or thing "be altered or false 'on its face,' " as argued by the defendant. (*Bamberg*, at p. 627.) The court stated that whether "evidence is 'false' under section 134 depends upon what it is intended to depict or represent as 'genuine or true.' In other words, falsity is not an absolute quality. It can turn upon what the evidence is offered to prove." (*Bamberg*, at p. 627.) The court reasoned that the photographs were " 'false' because they were offered as 'genuine and true' depictions of something other than what they actually represent." (*Id*. at p. 628.) Thus, the court held that "the photographs offered by [the defendant] were false in that they depicted something other than what [the defendant] claimed they showed." (*Id*. at p. 621.) Likewise, here, the declarations were false because they claimed something that happened other than what actually happened.[12]

In *Morrison, supra*, 191 Cal.App.4th 1551, the court held that section 134 was violated "by a probationer who prepares a false urine sample with intent to produce it to his probation officer during court-ordered drug testing." (*Morrison*, at p. 1553.) The

___

[12] We also note that the false evidence in *Bamberg* was a combination of both real and testimonial evidence, and thus, *Bamberg* is an example showing that no distinction between real and testimonial evidence is required under section 134.

defendant in *Morrison* "concede[d] that he prepared a false thing with a deceitful purpose." (*Id.* at p. 1555.) The urine sample was "false" within the meaning of section 134 because the defendant utilized a "urine substitution apparatus" defendant purchased at a "head shop" when he provided the urine sample during a routine visit to his probation office. (*Morrison*, at p. 1554.) Similar to the court in *Bamberg*, the *Morrison* court concluded that the application of section 134 to the false evidence defendant created was consistent with the statute's purpose of preventing fraudulent introduction of material in a proceeding under authority of law. *(Morrison*, at p. 1556.)

In *People v. Bhasin* (2009) 176 Cal.App.4th 461 (*Bhasin*), the defendant went to DMV and provided false information regarding the registered owner of a vehicle involved in a transaction underlying a pending prosecution against him for identity theft and a fraudulent loan transaction. (*Id*. at p. 463.) Based on the information furnished by the defendant, the DMV generated a "report of deposit of fees (RDF) that listed John Ferguson (the person whose identity [the] defendant was charged with stealing and in whose name he allegedly obtained a fraudulent loan) as the registered owner of the" vehicle. (*Id*. at pp. 463-464.) The defendant provided the RDF to his attorney, and, at trial, defense counsel cross-examined Ferguson with the document after Ferguson denied that he was the registered owner of the vehicle. (*Id*. at p. 464.) It came to light at trial that the defendant had procured the document containing the false information. (*Ibid*.) The defendant was subsequently charged with and convicted of, inter alia, a violation of section 134, and the Court of Appeal affirmed. (*Bhasin*, at p. 464.) At issue in *Bhasin* was whether the defendant "prepared" the RDF within the meaning of section 134, despite the fact that the report was actually generated by the DMV. (*Bhasin*, at p. 469.) The court concluded that he did. (*Id*. at p. 470.) Although the document was a DMV RDF, it was deemed false; "[t]he bottom line in this case is that the RDF contained false information that was provided by [the] defendant. Defendant went to the DMV and

33

obtained this document *clearly by providing some sort of false information.*" (*Ibid.*, italics added.)

In *People v. Laws* (1981) 120 Cal.App.3d 1022 (*Laws*), defendant submitted to the court a false receipt showing he had made full restitution to a crime victim and thereby complied with his conditions of probation. (*Id*. at pp. 1027-1028.) Defendant had not actually paid the full amount of restitution and had duped the victim into signing the receipt. (*Id*. at pp. 1026-1027.) Defendant was prosecuted for a violation of section 134 for submitting the receipt containing false information. (*Laws*, at p. 1026.) In arguing on appeal that the evidence was insufficient to support the conviction for section 134, defendant asserted that the receipt was "regular on its face" and therefore did not constitute a false paper within the meaning of section 134. The *Laws* court rejected that contention and concluded the evidence established that the defendant "knew that the receipt was literally false and that he intended to use it in the prior proceedings to mislead the court into finding that he had complied with his conditions of probation." (*Laws*, at pp. 1029-1030.)

Defendant has not, and based on our research cannot, point to a case stating that, for prosecution under section 134, a document must be a forgery or must be altered. Furthermore, contrary to defendant's contention, the declarations here were not the genuine declaration of each declarant; they each contained false information furnished for them by defendant (or with defendant's assistance). As the People assert, the declarations were deceitful. While the documents may have been what they purported to be in one sense—they were declarations signed by the declarants—they were not what they purported to be in another sense; they contained false representations provided by defendant that were not the declarants' true statements. Similar to the restitution receipt in *Laws* and the DMV RDF in *Bhasin*, defendant prepared for submission to a court a paper or other matter or thing she knew contained false information in the form of the declarations at issue.

34

We conclude that the declarations were false within the meaning of section 134.

**3. The *Williamson* Rule**

Defendant asserts that, because a false statement in a declaration signed under penalty of perjury is governed by a specific statute, section 118, prosecution under the more general section 134 is precluded. Defendant asserts that perjury is the appropriate charge when someone makes a materially false statement in a declaration signed under penalty of perjury, and section 127, subornation of perjury, is the appropriate charge when someone willfully procures another to commit perjury. Defendant asserts that the rule in *In re Williamson* (1954) 43 Cal.2d 651 (*Williamson*) is applicable to these circumstances.

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. [Citation.] 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' [Citation.] 'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . ." ' " (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*).)

"Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the

35

face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' [Citation.] In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute." (*Murphy, supra*, 52 Cal.4th at p. 86.) If the *Williamson* rule applies, "the prosecution lacks power to prosecute under the general statute where the alleged facts parallel the acts proscribed by the more specific statute." (*People v. Cockburn* (2003) 109 Cal.App.4th 1151, 1158 (*Cockburn*).)

"On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute. In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely." (*Murphy, supra*, 52 Cal.4th at p. 87.)

"However, that the general statute contains an element not within the special statute does not necessarily mean that the *Williamson* rule does not apply. 'It is not correct to assume that the [*Williamson*] rule is inapplicable whenever the general statute contains an element not found within the four corners of the "special" law. Rather, the courts must consider the *context* in which the statutes are placed. If it appears from the entire context that a violation of the "special" statute will necessarily or commonly result in a violation of the "general" statute, the *Williamson* rule may apply even though the elements of the general statute are not mirrored on the face of the special statute.' " (*Murphy, supra*, 52 Cal.4th at p. 87.)

The elements of preparing false evidence under section 134 are: "(1) the defendant prepared a false or antedated book, paper, record, instrument in writing, or other matter or thing, (2) with the intent to produce it, or allow it to be produced as

36

genuine or true, upon any trial, proceeding, or inquiry authorized by law, (3) for any fraudulent or deceitful purpose." (§ 134; *Bhasin, supra*, 176 Cal.App.4th at p. 469.)

The elements for the crime of perjury are: (1) a willful statement, (2) the statement was made under oath or affirmation, (3) the statement involved a material matter; and (4) the witness knows the statement is false. (§ 118, subd. (a); *People v. Garcia* (2006) 39 Cal.4th 1070, 1091.) When the perjury is by declaration, the defendant must also deliver the declaration to someone else intending that it be uttered or published as true. (*People v. Griffini* (1998) 65 Cal.App.4th 581, 583, 596 (*Griffini*).)

Subornation of perjury involves the procurement of perjury; in other words, the defendant procures someone to make a willful statement, under oath, of material matter which the witness knows to be false. (§ 127.)[13] The elements of subornation of perjury are: (1) a corrupt agreement to testify falsely; (2) proof that perjury has in fact been committed; (3) the statements of the witness who committed perjury are material; and (4) such statements were willfully made with knowledge as to the falsity of the statements. (*People v. Jones* (1967) 254 Cal.App.2d 200, 217.) For the first time, defendant argues in her reply brief the *Williamson* rule should apply on the theory that defendant aided and abetted perjury, citing *People v. Grinnel* (1968) 257 Cal.App.2d 653, 660. As we shall explain, given the elements of perjury and subornation of perjury, defendant's conduct relative to the declarations of the petition signers is not covered by sections 118 and 127, and thus, the *Williamson* rule does not apply to those declarations.

In discussing the underlying rationale for the *Williamson* rule, our high court has stated: "In adopting a specific statute, the Legislature has *focused its attention on a particular type of conduct and has identified that conduct* as deserving a particular

---

[13] Section 127 provides: "Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured."

punishment. Consequently, we infer that the Legislature intended that *such conduct* should be punished under the special statute and not under a more general statute." (*Murphy*, *supra*, 52 Cal.4th at p. 91, italics added.) "Because the *Williamson* rule 'prohibits prosecution under a general statute when the *conduct at issue is covered under a more specific statute*' [citation], a necessary predicate to the application of the rule is that the defendant's conduct fits the elements of the assertedly more specific statute." (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 622.) Here, the evidence establishes that defendant duped the petition signers into signing declarations. There was no agreement to provide false information. The petition signers' statements were neither willful nor were the statements made with the declarants' knowledge that the statements were false. Thus, neither perjury nor subornation of perjury covers defendant's conduct regarding the petition signers' declarations. Consequently, defendant could not be convicted of these assertedly more specific statutes and the *Williamson* rule does not apply. A prosecution for section 134 cannot be preempted under the *Williamson* rule by offenses defendant did not commit. (*Montalvo*, at p. 623.) However, defendant's own declaration requires *Williamson* rule analysis.[14]

The elements of section 134 and perjury by declaration under section 118, subdivision (a) do not correspond. (See generally *Murphy*, *supra*, 52 Cal.4th at p. 86.)

---

[14] Instead of charging each declaration as a separate count of section 134, the prosecution alleged a single count of section 134 and theorized that defendant could be convicted of that count based on any or all of the declarations. The jury was given a unanimity instruction which read: "You may not find the defendant guilty unless all of you agree that the People have proved that the defendant prepared at least one false statement to be used in evidence and you all agree on which particular false statement the defendant prepared and used." In closing argument, the prosecutor presented a theory to the jury that any of the declarations constituted the charged crime, but he also argued that if the jury did not believe defendant violated section 134 by participating in the preparation of the petition signers' declarations, the jury could nevertheless convict defendant based on the preparation of her own declaration.

Section 134 pertains to the production of a variety of evidence, whereas section 118 pertaining to declarations applies only to declarations made under penalty of perjury. Section 134 requires that the defendant prepare the false item with the intent to produce it, or allow it to be produced as genuine or true upon any trial, proceeding, or inquiry authorized by law for any fraudulent or deceitful purpose. Further, section 134, does not require, as does perjury by declaration, that the matter or thing be signed under penalty of perjury. Additionally, perjury requires a showing of materiality, an element that we conclude *post*, is not required for a violation of section 134. And given the apparent heightened culpability associated with going to the effort of *preparing* the paper, matter or thing along with the requisite intent, the Legislature did not require that the item actually be produced in a proceeding. Perjury by declaration, on the other hand, requires a delivery of the declaration with the intent that it be uttered or published as true. (*Griffini, supra*, 65 Cal.App.4th at pp. 583, 596.)

We therefore turn to the second test for application of the *Williamson* rule. " 'If it appears from the entire context that a violation of the 'special' statute will necessarily *or commonly* result in a violation of the 'general' statute, the *Williamson* rule may apply even though the elements of the general statute are not mirrored on the face of the special statute.' " (*People v. Joseph* (2019) 32 Cal.App.5th 954, 965, quoting *Murphy*, *supra*, 52 Cal.4th at p. 87 & *People v. Jenkins* (1980) 28 Cal.3d 494, 502, italics added.) Thus, we must ask whether it appears that a violation of section 118 will necessarily *or commonly result* in a violation of section 134 given the context in which the statutes are placed here. (*Murphy*, at p. 87.) In answering this question, we must first consider how defendant could be said to have violated the assertedly more specific statute — here, section 118 — because when a specific statute may be violated in multiple ways, the *Williamson* analysis focuses solely on that part of the statute that is applicable to the defendant's conduct at issue. (*Murphy*, at pp. 89-91; *Joseph*, at p. 966 ["when a special statute may be violated in two ways, the analysis focuses solely on the way in which the defendant

39

violated the statute"]; see *People v. Henry* (2018) 28 Cal.App.5th 786, 793 ["when a special statute can be violated in two different ways, one of which does not violate the general statute, the reviewing court should consider only if the present conduct at issue would commonly violate the general statute"].) Second, we must determine whether a violation of that applicable part of the specific statute at issue would " 'necessarily *or commonly* result in a violation of the general statute.' " (*Joseph*, at p. 965, italics added.)

Here, if defendant violated the perjury statute, it would have been perjury by declaration, not other forms of perjury such as testifying falsely in court. (See fn. 10, *ante*.) While signing a perjurious declaration may not always be done with the intent that it be produced in a trial, proceeding, or inquiry authorized by law, it seems clear that declarations are commonly signed for such purposes. This normally would be the end of the analysis and we would conclude that the *Williamson* rule precludes a prosecution for the general statute. However, as our high court explained in *Murphy*: "In adopting a specific statute, the Legislature has focused its attention on a particular type of conduct and has identified that conduct as *deserving a particular punishment*." (*Murphy*, *supra*, 52 Cal.4th at p. 91, italics added.)

This court has previously recognized the import of the legislatively authorized punishment in applying the *Williamson* rule. In *Cockburn*, *supra*, 109 Cal.App.4th 1151, this court held that the *Williamson* rule does not apply where the general statute does not provide a more severe penalty than the special statute. (*Id*. at p. 1159.) This court reasoned that this conclusion flows from our high court's observation that "when the Legislature has enacted a specific statute addressing a specific matter, and has prescribed a sanction therefor, the People may not prosecute under a general statute that covers the same conduct, *but which prescribes a more severe penalty*, unless a legislative intent to permit such alternative prosecution clearly appears." (*Ibid*., quoting *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250.) Our high court observed in *Mitchell* " 'Typically the issue whether a special criminal statute supplants a more general criminal statute

40

arises where the special statute is a misdemeanor and the prosecution has charged a felony under the general statute instead. [Citations.] Such prosecutions raise a genuine issue whether the defendant is being subjected to a greater punishment than specified by the Legislature, and the basic question for the court to determine is whether the Legislature intended that the more serious felony provisions would remain available in appropriate cases.' " (*Mitchell*, at p. 1250, fn. 14.)

The cases upon which defendant relies involve general statutes punishable as felonies with specific statutes punishable only as misdemeanors or wobblers subject to misdemeanor punishment. That is not the case here. Both section 134 and section 118 are felonies. With the enactment of the Criminal Justice Realignment Act in 2011 (Realignment Act), perjury is now punishable by incarceration in county jail pursuant to section 1170, subdivision (h) for a triad of two, three, or four years. (§ 126.) Prior to the Realignment Act, perjury was punished by the same triad in state prison. The sentencing triad for preparation of false documents under section 134 is 16 months, two or three years in state prison. (§§ 18[15], 134.) Perjury, the assertedly more specific statute is actually punishable by a longer period of incarceration than preparing false documents, the assertedly more general statute.

Defendant argues that, because the triad for perjury is to be served in county jail after the Realignment Act, the punishment for perjury is "less onerous." The Realignment Act shifted responsibility for housing and supervising certain felons from state prison to county jails so that they serve their terms of imprisonment locally rather

---

[15] No sentence is specified in section 134; the statute sets forth the prohibited conduct and then states that conduct makes a person "guilty of a felony." Section 18, subdivision (a) provides: "Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a felony is punishable by imprisonment for 16 months, or two or three years in the state prison unless the offense is punishable pursuant to subdivision (h) of Section 1170." The punishment for section 134 was not changed by the Realignment Act.

41

than in state prison. (*People v. Noyan* (2014) 232 Cal.App.4th 657, 664.) Defendant points out that felony offenders sentenced to county jail are not subject to parole. However, there is a presumption that a defendant sentenced to county jail will serve a portion of the sentence under mandatory supervision. (Cal. Rules of Court, rule 4.415(a).)[16] Defendant asserts that defendants sentenced under section 1170, subdivision (h) might be eligible for home detention under section 1203.016, but the Legislature did not require that home detention be made available to all defendants in all counties; rather the Legislature left the decision to expand the use of home detention for such defendants up to the various county boards of supervisors. (§ 1203.016, subd. (a).) Defendant notes that a defendant sentenced to a county jail triad is eligible for credits essentially at a half-time rate. (§ 4019, subds. (b), (c), (f).) However, section 2933, subdivision (b), governing postsentence credit for most persons sent to state prison provides that an inmate may earn six months of conduct credit for every six month of actual custody and a lesser amount of credit based on the same ratio is awarded for any lesser period of continuous incarceration. Thus, while there are some differences in the sentencing schemes for sections 134 and 118, like in *Cockburn*, in our view, these provisions are "a wash" for purposes of application of the *Williamson* rule. (See *Cockburn*, *supra*, 109 Cal.App.4th at p. 1159.)[17] "Certainly there is nothing in the sentencing schemes of these

---

[16] Rule 4.415(a) provides: "Except where the defendant is statutorily ineligible for suspension of any part of the sentence, when imposing a term of imprisonment in county jail under section 1170(h), the court must suspend execution of a concluding portion of the term to be served as a period of mandatory supervision unless the court finds, in the interests of justice, that mandatory supervision is not appropriate in a particular case. Because section 1170(h)(5)(A) establishes a statutory presumption in favor of the imposition of a period of mandatory supervision in all applicable cases, denials of a period of mandatory supervision should be limited."

[17] In *Cockburn*, the court concluded that a prosecution for section 273a, felony child abuse (general statute) is not preempted by section 273d, corporal injury on a child (specific statute). (*Cockburn, supra*, 109 Cal.App.4th at pp. 1156-1157.) The court

two statutes approaching the felony/misdemeanor distinction that is the '[t]ypical[]' case calling for exclusive application of a special statute." (*Id*. at p. 1160.)

### 4. Conclusion

We conclude that defendant was properly prosecuted under section 134.

## II. Substantial Evidence of a Violation of Section 134

### A. Defendant's Contentions

Defendant makes a number of substantial evidence arguments. Defendant asserts that there was insufficient evidence that she prepared any of the declarations other than her own. Defendant further asserts that many of the statements that were alleged to be false were not literally false. As for those statements proven to be false, defendant asserts that there was insufficient evidence to prove that she knew the statements were false. Additionally, defendant asserts that none of the allegedly false statements were demonstrated to be material, which, she contends, is necessary to support her conviction. We disagree and conclude there was substantial evidence to support the conviction.

### B. Standard of Review

"A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) "Even when there is a significant

---

reasoned that "[t]he general/special statute rule does not apply . . . , because the general statute, section 273a, does not provide a more severe penalty than the special statute, section 273d." (*Id*. at p. 1159.) The court noted that both crimes carried the same sentence, but the minimum term of probation for section 273a was a year longer than for section 273d, violation of section 273d could result in a $6,000 fine not available for violation of section 273a, and a prior conviction under section 273d could enhance a sentence for a subsequent conviction of that offense whereas there was no similar provision under section 273a. (*Cockburn*, at p. 1159.) These differences were "a wash" in the *Cockburn* court's view. (*Id*. at pp. 1159-1160.)

amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*Ibid.*)

We must accept all logical inferences that the jury may have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Kaufman* (2017) 17 Cal.App.5th 370, 381.) It is well-settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*); *People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*); *People v. Spencer* (1969) 71 Cal.2d 933, 937 (*Spencer*).)

## C. Analysis

### 1. Preparation

Defendant asserts the evidence was insufficient to establish that she prepared the petition signers' declarations. We disagree. The evidence showed, at a minimum, that defendant participated in the preparation of the declarations. Indeed, without her conduct, none of these documents would have been completed.

"The word 'prepare' is unambiguous." (*Bhasin, supra*, 176 Cal.App.4th at p. 469.) Citing a version of Webster's Dictionary, the *Bhasin* court defined "prepare" in the context of section 134 as " 'to make ready beforehand for some purpose,' 'to put together[,] . . . make, produce,' 'to put into written form: draw up,' or 'to make . . . ready: get ready.' " (*Bhasin*, at p. 469.) The *Bhasin* court noted that the definition of "prepare" in Black's Law Dictionary includes: " '[t]o provide with necessary means; to make ready; to provide with what is appropriate or necessary.' " (*Ibid.*) We agree those ordinary meanings apply here.

44

There is no requirement that the defendant be the sole preparer of the evidence to satisfy the preparation element of section 134. Indeed, as defendant acknowledges, a person does not have to actually draft a document that is the subject of section 134 prosecution. The defendant in *Bhasin* was found guilty of violating section 134, and the Court of Appeal determined that substantial evidence supported that conviction, based on his actions of providing false information to the DMV, which, based on the information furnished by the defendant, produced the document defendant produced in court. (*Bhasin, supra*, 176 Cal.App.4th at p. 470.) The evidence presented at trial here established that defendant participated in the preparation of the declarations, even if as she asserts on appeal, the declarations were typed by her attorney.

While these form declarations were pre-typed, their preparation was not complete until the blanks were filled in and each declarant signed. Defendant furnished each of the declarants with the form declaration, and they signed them. Without that conduct, the preparation of the declarations would not have been completed and there would have been no declaration from any of the petition signers. This conduct was sufficient to establish the preparation element, but there is more. Additionally, the evidence as to all the declarants, except Nelson showed that defendant told them to fill in the blanks, explained how the blanks should be filled in, or told the declarant where to sign. This direction and/or explanation further contributed to the preparation of each declaration.

Additionally, Lukens testified that he did not print the word "November" and handwriting for that word was not his. Defendant told Lukens she would fill that in for him. This conduct further contributed to the preparation of Lukens's declaration. Also, Lukens said regarding the declaration, "what was explained to me and what's on the paper was two different things" and that he made a mistake by "going off of just what somebody said instead of reading it." Defendant's conduct in misleading Lukens also contributed to the preparation of his declaration.

45

As for Kirk, she testified that defendant went over the declaration with her and read the declaration to her. Defendant's conversation with Kirk led Kirk to trust her. This conduct contributed to the preparation of Kirk's declaration.

Similarly, defendant was successful in gaining Arnold's trust. Asked why she signed a document that she did not read, Arnold testified, "I just believed her." Arnold explained that she "took it in good faith that everything was okay." Defendant's conduct in gaining Arnold's trust contributed to the preparation of Arnold's declaration. Arnold also testified that defendant visited her three times and had her sign documents on the second and third occasions. Both times defendant insisted that her attorney wanted Arnold to sign. This conduct further contributed to the preparation of the Arnold declaration.

As for Nelson, the sight-impaired individual suffering from dementia, his caretaker did not hear the initial discussion defendant had with him. Whatever conversation defendant had with Nelson, it can reasonably be inferred that some portion of it must have pertained to the declaration. That is why defendant was there. And the caretaker testified she only read the portions of the document where blanks needed to be filled in. Defendant's conduct contributed to the preparation of the Nelson declaration.

In an apparent attempt to distinguish her case from *Bhasin, supra*, 176 Cal.App.4th 461, defendant asserts that there "is no evidence that she specifically instructed her attorney on what information to put into the typewritten declarations," and that it "cannot be determined whether she supplied any information herself or whether the documents were drawn up by the attorney himself." We agree that there was no *direct* evidence that defendant furnished relevant information to her attorney. However, under the substantial evidence standard, " '[s]ubstantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57, quoting *In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) Thus, while there was sufficient evidence to establish the preparation element based on

46

defendant's conduct when she presented the form declarations to the declarants, we agree with the People that a reasonable jury could infer from the totality of the evidence that defendant furnished information for the declarations.

Defendant was the person most invested in defeating the recall campaign against her and was highly involved in the effort to defeat the recall. Defendant personally reported to the Sheriff and then to Magrini that Kobe had circulated recall petitions and gathered signatures and that she was not allowed to do so because she was not a resident of Shasta Lake. Defendant told Magrini she was seeking an injunction. Defendant's own declaration supporting her request for injunctive relieve demonstrates that she familiarized herself with the circumstances of the recall petition being circulated against her. Moreover, allegations in defendant's declaration mirrored information in the petition signers' declarations. This information includes the representations that Kobe was a member of the Gateway School Board, that Kobe was part of the committee supporting the recall, that Kobe went to Nelson's house, that nobody was with Kobe circulating the petition, and that Kobe was not a resident of Shasta Lake. A reasonable jury could conclude from the fact that this information was in defendant's declaration that she furnished that same information for inclusion in the other declarations. Indeed, the record does not demonstrate that there was anyone else who would have provided this information for inclusion into the declarations whenever they were pre-typed.

The substantial evidence standard of review " 'is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably

be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*People v. Harris* (2013) 57 Cal.4th 804, 849-850.)

We conclude that the circumstantial evidence was sufficient to give rise to the reasonable inference that defendant furnished the foregoing information for inclusion in the petition signers' declarations. As we have noted, reversal for insufficient evidence " ' "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142; *Zamudio, supra*, 43 Cal.4th at p. 357; *Bolin, supra*, 18 Cal.4th at p. 331; *Spencer, supra*, 71 Cal.2d at p. 937, italics added.) That is certainly not the case here. Armed with the form declarations, defendant then visited the declarants, furnished the declarations, directed or explained that they needed to fill in the blanks and had each declarant sign. We conclude that the evidence was sufficient to establish that defendant "prepared" the declarations within the meaning of section 134.

### 2. Falsity

#### a. "There were no other persons with her circulating the petition."

Defendant contends that the statement in the declaration that "There were no other persons with [Kobe] circulating the petition" does not literally state that Kobe was "alone" when she approached the declarants. Instead, according to defendant, this language was also susceptible to another interpretation — that there were no other persons with Kobe who were circulating the petition, meaning that if Kobe was accompanied by someone else, Kobe was the only one circulating the petition. Defendant argues that this interpretation is the appropriate one and that the prosecutor's interpretation of this language, on the other hand, renders the phrase at the end of the sentence, "circulating the petition," superfluous. According to defendant, because the statement was susceptible to two interpretations and the prosecutor failed to prove that the statement was intended in a way that would be consistent with guilt, defendant cannot properly be convicted.

48

The statement that "[t]here were no other persons with [Kobe] circulating the petition" most certainly can be read as stating that Kobe was unaccompanied at the time when she was circulating the recall petition. When this statement was called to the attention of the declarants and Nelson's caregiver, each understood the statement to reflect that meaning and each said it was untrue because Kobe was with at least one other person.

Lukens testified it was actually the other person who was with Kobe who explained the petition and handed it to him, and he testified he that he told defendant "that there was other people there with Ms. Kobe."[18] Ala testified that there was someone else with Kobe and defendant knew it because the two of them discussed it. It can be inferred that defendant knew about this second person independent of Ala informing her of his presence because when Ala mentioned he had prosthetic legs, defendant asked whether he was wearing shorts, and the man indeed had been wearing shorts. Kirk testified that she told defendant that there was someone with Kobe when Kobe approached her. In fact, she and defendant tried to figure out who the other woman was. Nelson's caretaker said Kobe was with another person when Nelson signed the petition. Morgan testified she was the person with Kobe on that occasion. This testimony contradicted defendant's declaration, in which she stated that she observed Kobe approach Nelson's residence and produce a piece of paper defendant believed to be the recall petition, followed by "some discussion between Kobe and Nelson," and Kobe assisting Nelson in signing the petition. Defendant declared, "[t]here were no other

---

[18] As defendant points out, Lukens previously testified at the preliminary hearing that he had not told defendant there was another person with Kobe. However, in reviewing for substantial evidence, appellate courts do not resolve credibility issues or evidentiary conflicts. (*Zamudio, supra*, 43 Cal.4th at p. 357.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Ibid*.)

persons with Kobe circulating the petition." Thereafter, Kobe left Nelson's residence and walked southbound on Main Street according to defendant's declaration. All of this defendant said she observed from her vehicle parked across the street, and defendant never mentioned seeing anyone else in the company of Kobe.

In the face of this evidence, defendant posits a newly minted interpretation of the language in the declarations that, while others may have been present with Kobe visiting the declarants at their homes, no one other than Kobe was engaged in the act of circulating the petition. But this does not square with the testimony of the declarants who remembered which of the two people had them sign the petition. Lukens testified that the woman who was with Kobe explained the petition to him, presented it to him and told him where to sign. Kirk testified the person who was with Kobe told her what the petition was about and asked her to sign it. Morgan testified that, while Kobe may have done most of the talking when they visited Nelson, Morgan was the one who circulated the petition.

Moreover, defendant never mentioned this newly minted interpretation of the statement, "[t]here were no other persons with her circulating the petition," in her second interview with Magrini, despite the fact that Magrini read this language from the declarations to defendant and confronted her multiple times with the declarants' statements that Kobe was with someone else when they signed the petition. Instead, defendant resorted to calling the declarants "cowards," accusing them of not telling the truth and "backing out" because they were afraid. Then defendant postulated that perhaps Kobe was on one side of the street while the person she was with was on the other side of the street and that they were not "together door to door." When Magrini repeated that none of the declarants were saying Kobe was by herself, defendant's response was to ask "what about" Arnold and Kirk?

Advancing her newly minted interpretation on appeal, defendant relies on case law relevant to perjury, holding that a statement that is *literally true* cannot be deemed false.

50

Under this theory, she argues she could not be guilty of a violation of section 134 based on such a statement. We reject this argument because defendant seeks to apply the literally true rule outside the context in which it is normally applicable, testimony that is the result of questions and answers.

Relevant to a prosecution for perjury, "[t]he testimony of a witness is ordinarily elicited either by general questions seeking a narration of events or a series of specific questions calling for specific answers as to each fact. [Citations.] When counsel uses the latter method the witness should respond to the question. He [or she] should not evade or volunteer matters not specifically asked for." (*In re Rosoto* (1974) 10 Cal.3d 939, 949.) "[W]hen . . . a witness' answers are literally true he [or she] may not be faulted for failing to volunteer more explicit information. Although such testimony may cause a misleading impression due to the failure of counsel to ask more specific questions, the witness' failure to volunteer testimony to avoid the misleading impression does not constitute perjury because the crucial element of falsity is not present in his testimony." (*Id*. at pp. 949-950, citing *Bronston v. United States* (1973) 409 U.S. 352, 357-359 [34 L.Ed.2d 568, 573-574].)

Defendant relies on *United States v. Wall* (6th Cir. 1967) 371 F.2d 398. In *Wall*, the defendant was convicted of perjury based on her answer, before a grand jury, to the question "Have you ever been on trips with Mr X?" (*Id*. at p. 399.) The defendant responded that she had not. (*Ibid*.) In a hearing, an Assistant United States Attorney acknowledged that the meaning of the words " 'by a trip -- on a trip' " could mean " '[t]hat person accompanied somebody else travelling with, or it can mean that they were there at a particular place with a person.' " (*Ibid*.) The United States Court of Appeals for the Sixth Circuit concluded that the "question upon which the perjury charge was based, was inarticulately phrased, and, as admitted by the prosecution, was susceptible of two different interpretations. In our opinion, no charge of perjury can be based upon an answer to such a question." (*Id*. at pp. 399-400.)

51

The rationale for this literally true analysis—counsel's right to pose questions as he or she wishes and the witness's prerogative as to how to answer the specific questions posed and his or her right to decline to volunteer more—does not apply here. Where a defendant is prosecuted under section 134 for preparing a false declaration, the representations at issue are not responsive to adversarial or other examination. Instead, they are wholly the product of what the person preparing the declaration chooses to offer.

In any event, even if this literally true analysis applied here, we agree with the People that a reasonable jury could find, beyond a reasonable doubt, that the statement, "[t]here were no other persons with her circulating the petition" could only be interpreted in one way—that nobody else was with Kobe at the time she was circulating the petition. (Cf. *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 338, disapproved on other grounds in *People v. Whitmer* (2014) 59 Cal.4th 733, 739-742 [a jury could find beyond a reasonable doubt that a probate court order could be reasonably interpreted only one way, and that Kronemyer deliberately lied when he made his statement in an accounting responsive to that court order].) This conclusion is consistent with the declarants' own testimony reflecting their understanding of this statement. We do not credit defendant's argument that somehow the declarants would import defendant's technical definition of "circulating the petition" and intend to declare, through the statement that "[t]here were no other persons with [Kobe] circulating the petition," that, while there were other persons with Kobe at the time, none of them except Kobe seemed to be engaged in the act of circulating the petition.

### b. "I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero."

Separate from the statement indicating that Kobe was alone while circulating the petition, we conclude there is legally sufficient evidence to support the conviction based on the statement in the declarations concerning the purpose of the petition. Except for Lukens and Nelson (whose declarations falsely stated they declined to sign the petition),

each declaration stated that the declarant signed the recall petition based on the representation by Kay Kobe that the petition was not for the recall of Dolores Lucero. It can be reasonably inferred that that statement was included so that defendant could argue the declarants were misled and their signatures and/or the petition should be invalidated.

Defendant asserts on appeal that the statement, "I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero," was literally true because the petition itself would not have the effect of recalling defendant, but instead would only put the issue on the ballot. According to defendant, a petition circulator "could truthfully tell voters that they are just collecting signatures to put the issue on the ballot, and that by signing the petition, the voter is not required to take a stand on the issue." Defendant then goes on to state that "there is no evidence that Kay Kobe did not use that approach to gather signatures on this recall petition. Thus, the statement could be literally true, and as such, it was not proven false." While we find defendant's interpretation of the statement that Kobe was alone while circulating the petition to be strained, we find the interpretation she advocates as to this statement even more implausible.

While there was no evidence to establish Kobe did not use this approach, there was also no evidence that she did. None of the declarants said they understood the statement the way defendant now espouses. None testified that Kobe told them the petition would not result in a recall, but would only place the question on the ballot. Indeed, they were never asked on cross-examination whether such a statement was made. Moreover, defendant never asked Kobe whether she used this approach, even though defendant called Kobe as a defense witness.

When the statement in the declaration was called to the declarants' attention, they understood it for what it says — that they purportedly signed the petition because Kobe told them it was for something other than defendant's recall and that was not true. Ala, Kirk and Arnold all indicated they knew what the petition was for and were not misled.

53

Ala testified she never told defendant she had been misled. Kirk testified she expressly told defendant she knew what she had signed. Marks, Nelson's caretaker, knew the petition was to recall defendant and helped Nelson sign it.

Given the declarants' testimony, there was substantial evidence this statement from their declarations was false.

### 3. Fraudulent or Deceitful Purpose

Defendant asserts that there was insufficient evidence to prove that she acted with fraudulent or deceitful purpose in obtaining the declarations. We disagree. The evidence was sufficient to establish that defendant duped the declarants into signing their declarations containing statements that were not true for the purpose of submitting this fraudulent matter to the court to support her litigation to halt the recall when there were no legitimate grounds for the injunctive relief she sought. Additionally, the evidence established that defendant submitted the declarations to law enforcement officials for the purpose of having them investigate Kobe.

Defendant argues that if Kobe was the one circulating the petition by carrying it from door to door and officially witnessing the signatures, then defendant could have believed the statement in the declarations about no other persons being with Kobe circulating the petition to be literally true. However, we have concluded that a jury could find, beyond a reasonable doubt, that this statement could only be interpreted in one way—that Kobe was alone at the time she was circulating the petition. Moreover, based on the evidence discussed *ante*, defendant knew this statement was false. Most telling in this regard is the contrast between defendant's purported observation of Nelson signing the petition and the testimony of his caretaker and Morgan. It can be reasonably inferred that defendant failed to mention anyone else being present with Kobe and stated that it was Kobe who appeared to explain the petition to Nelson as part of her scheme to deceive the court.

54

The evidence also establishes that defendant acted with a fraudulent or deceitful purpose as to the statement concerning the purpose of the petition. There would be no reason to include this statement as stated in the declarations if it really meant what defendant now claims it meant—that the petition was not literally for defendant's recall, but rather to put the issue on the ballot. Rather, it can be inferred that the statement was written as worded to prove that people had been misled into signing the petition in order to support defendant's attempt to invalidate the recall.

There were additional false statements in the declarations about which defendant was aware that establish defendant's scheme to deceive the court when she applied for injunctive relief. For example, Lukens's declaration did not include the statement, "I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero." Instead, his declaration stated that he declined to sign the petition. This, Lukens testified, was false. Moreover, he told defendant that he signed the petition. Similarly, Nelson's declaration stated he declined to sign the petition. This was proven false by the testimony of his caretaker who testified he signed and she helped him. Remarkably, defendant's own declaration establishes her knowledge of the falsity of Nelson declining to sign the petition. Defendant indicated in her declaration she purportedly saw Nelson sign the declaration when Kobe presented it to him. Additionally, Arnold's declaration stated, "I do not want my name to be counted as a voter in support of such petition and request to be removed from such petition." Yet Arnold testified that she never told defendant she wanted to have her name removed from the recall petition.

Defendant contends there was insufficient evidence to establish any of the false statements in the declarations were material, and absent evidence that the statements were material, the evidence is insufficient to show they were included in the declarations for a fraudulent or deceitful purpose. As we discuss *post*, materiality is not an element of section 134. Even so, the statement that "[t]here were no other persons with her

55

circulating the petition" and the statement that "I signed the petition based on the representation by Kay Kobe that this was not for the recall of Dolores Lucero " are clearly material in the sense that they provided arguments to support defendant's attempt to halt her recall, and it can be fairly inferred that is why these statements were included.

We conclude that substantial evidence supports the conclusion that defendant acted with fraudulent or deceitful purpose.

#### 4. Defendant's Declaration

Defendant asserts that the lone alleged falsehood in her declaration was that, "On the date Kobe approached Mr. Nelson, [Kobe] appeared to be holding a document in her hand. During this time there were no other persons with her circulating the petition." According to defendant, the declaration did not aver that Kobe visited Nelson alone. Defendant raises the same "circulating" argument she raised concerning the other declarations. Defendant asserts she believed Kobe was circulating the petition, and this was technically true because, defendant believed that anyone who was with Kobe could not also be circulating the petition. But if defendant really thought that anyone who was *with* Kobe could not also be circulating the petition, it made no sense for her to state that "there were no other persons *with* her circulating the petition." (Italics added.)

In addition to having us ignore the illogical nature of her argument on appeal, defendant would apparently have us ignore other parts of her declaration. Defendant also stated: "I observed Kobe approach Mr. Nelson, produce a piece of paper believed to be the recall petition, some discussion between Kobe and Nelson, and Kobe assisting Nelson in signing the document. [¶] I then observed Kobe leave the vicinity of Nelson's residence and proceed walking [s]outhbound on Main Street." Defendant went on to aver that, when she later approached Nelson, he told her: "He recalled that he signed a petition circulated by Kobe. He also advised that he was aware that Kobe was *alone* at such time." (Italics added.) Defendant's use of the word "alone" is telling in that it can be inferred from the use of that word that defendant sought to deceive the court into

56

believing that Kobe was by herself, not that, while Kobe may have been with another person, Kobe was the one circulating the petition. That she never mentioned anyone else being in Kobe's presence in her declaration and never mentioned her newly minted interpretation to Magrini further proves the same point. Moreover, defendant's statement concerning Nelson was proven false. Nelson's caretaker testified that two people came to Nelson's house with the recall petition, and that it was she who assisted Nelson in signing the recall petition. Morgan testified she was the one who had the petition and who circulated it.

In light of the totality of defendant's statements in her declaration, the testimony of the witnesses and the inferences that can be drawn therefrom, we conclude that there was substantial evidence that the statements in defendant's declaration that "there were no other persons with [Kobe] circulating the petition," that "Kobe assist[ed] Nelson in signing the document," and that Nelson "advised that he was aware that Kobe was alone at such time," were false. Moreover, based on Nelson's caretaker and Morgan's testimony, substantial evidence supports the conclusion defendant, who purportedly watched the whole transaction, knew these statements were false. Either that, or defendant never saw Kobe at Nelson's house, which would make her statement concerning her purported observations false.

## 5. Conclusion

Contrary to defendant's contentions, substantial evidence supported her conviction of a violation of section 134. Each declaration individually and also when considered collectively as part of defendant's scheme, coupled with witness testimony (and, in the case of Nelson's declaration, with the addition of defendant's declaration), furnishes substantial evidence "that (1) the defendant prepared a false . . . paper . . . or other matter or thing, (2) with the intent to produce it, or allow it to be produced as genuine or true upon any trial, proceeding, or inquiry authorized by law, (3) for any fraudulent or deceitful purpose." (*Bhasin, supra*, 176 Cal.App.4th at p. 469.)

### III. Exclusion of Evidence Concerning Prosecutor's Promise not to Prosecute Lukens

### A. Additional Background

Lukens was the first of the declarants to testify. During Lukens's direct testimony, as the prosecutor asked him about whether a statement in his declaration was false, the trial court excused the jury to have a discussion with the attorneys. With Lukens still present, the trial court stated that it occurred to the court that it was possible Lukens could incriminate himself to the extent that he acknowledged knowingly providing false information in a declaration.[19] The trial court advised Lukens of his rights, including his right to an attorney. The prosecutor stated that he had not anticipated the issue, because a declarant would have to knowingly make a false statement to be criminally liable, and "the People's theory in this case is that they did not know they were making a false statement." The prosecutor then stated, "I just want to make it clear on the record that there's no agreement with Mr. Lukens or any of the declarants to obtain their testimony on the basis of not filing charges." The prosecutor continued, "[t]he reason being, as the prosecutor in the matter, having reviewed the case, I don't believe there's a criminal intent on their part, so it wouldn't be an issue, but I understand why the Court's advising." The court stated that it would appoint an attorney for Lukens if he wished, and asked Lukens if he wanted an attorney. Lukens stated, "Uhm, if I could talk to --," apparently indicating the prosecutor. The following exchange ensued:

"[THE PROSECUTOR]: I'm not going to talk to you off the record. I'll just kind of try to re-emphasize in more layman's terms what I said.

---

[19] "When it appears that a witness may give self-incriminating testimony, the court has a duty to ensure that the witness is fully apprised of his or her Fifth Amendment rights. The court may do so by appointing counsel to advise the witness, or the court may elect to discharge this duty itself." (*People v. Schroeder* (1991) 227 Cal.App.3d 784, 788.) The trial court can avoid claims that the court's comments influenced the witness by appointing counsel.

"[THE COURT]: Right.

"[THE PROSECUTOR]: *Is that the Court has a concern that you might be confessing to a crime, knowingly providing false information. As a prosecutor, my perspective is I would never seek that charge against you based on what I've heard in court, because I don't believe you had knowledge of the falsehood.*

"[THE WITNESS]: Okay.

"[THE COURT]: Of the -- I'm sorry. Knowledge of the what?

"[THE PROSECUTOR]: Of the falsehoods contained within the declaration.

"[THE COURT]: Well, at the time that you signed that, were you aware that information that you were signing off on was incorrect?

"[THE WITNESS]: No, I wasn't. I wouldn't have signed it if I had known that those bottom ones weren't --

"[THE PROSECUTOR]: Which is why I was eliciting questions from him, how did this come to be filled out, did you read this, and he indicated, no, he had not read it.

"[THE COURT]: Right. Okay. I just want to clarify, because we went through some of those pretty quickly and it wasn't specified that, at the time that he signed it, not all these things were true. He didn't, like, read it carefully enough to know that and so on.

"[THE PROSECUTOR]: And I can bring out more questioning, I was going to towards the end kind of globally, how did you end up signing this document?" (Italics added.)

The court reiterated that it would appoint an attorney to represent Lukens if he wished. The court also stated, "*On the other hand, you've heard from [the prosecutor] as to what his intentions are*." (Italics added.) The court then excused Lukens, and the attorneys continued to discuss the matter with the court.

Defense counsel expressed concern that the matter would recur with other witnesses. He then stated: "And my concern is this: [The prosecutor] and I had not

59

anticipated this. I think the Court was right to do what the Court did. My concern, however, is -- and this isn't [the prosecutor's] fault, but the way this one was necessarily handled, because it came up in the middle of it, I'm worried about [the prosecutor] currying favor with the witness, saying I would never prosecute you, this kind of thing, well, and I would rather -- there's nothing we can do about that right now."

During defense counsel's cross-examination of Lukens, he began to ask, "You've been -- is it fair to say that [the prosecutor] here has promised not to prosecute you --." The court immediately directed the jurors to disregard defense counsel's question and excused the jurors and Lukens from the courtroom.

The prosecutor noted that, contrary to defense counsel's representation in his question, the prosecutor "specifically stated on the record before he went to break, I have never had such a conversation with these witnesses, and even though the Court thought it might be good for me to, I said I'm specifically going to decline to have those." The following colloquy then occurred:

"[DEFENSE COUNSEL]: This is what happened before lunch: I'm not talking about a promise [the prosecutor] made in the past to Mr. Lukens. Right before lunch he says, I really, really, really really don't plan on prosecuting you.

"[THE COURT]: Yeah, but he didn't, quote, promise him. Your -- the implication you took from that comment was inappropriate, and we should have had a discussion outside the presence of the jury if you were going to go there. You know, I brought it up on my own, Counsel.

"[DEFENSE COUNSEL]: Right.

"[THE COURT]: And, so, I dragged [the prosecutor] into it because of my role as judge.

"[DEFENSE COUNSEL]: Right.

"[THE COURT]: And he did express, very vehemently, that he was going to steer completely clear of that, as he is entitled to do, if he believes that there is no area that the witness is going to traipse around incriminating himself.

"[DEFENSE COUNSEL]: Well, as I understand it -- this is how I understood it: There are four of these witnesses that are going to testify.

"[THE COURT]: Right. Uh-huh.

"[DEFENSE COUNSEL]: [The prosecutor's] never had this conversation with any of them.

"[THE COURT]: Correct.

"[DEFENSE COUNSEL]: [The prosecutor] now does have this conversation with Mr. Lukens on the record while we're all sitting here.

"[THE COURT]: Well, no. He was talking to the Court, [defense counsel].[20]

"[DEFENSE COUNSEL]: Okay. But the -- but everybody gets the impression he's telling Mr. Lukens, I don't plan on prosecuting you. That's why Mr. Lukens is sitting here.

"[THE COURT]: No. No. No. You know, you took a lot out of that. The record's going to speak for itself on this issue.

"Here's what I'm going to do. I'm going to, in very strong terms, order the jury to completely disregard where you were going with that question, get it out of their minds, and we're going to move on now.

"[DEFENSE COUNSEL]: Okay. Can I make a record on this?

"[THE COURT]: 'On this' in terms of what? That you want to go further with it?

"[DEFENSE COUNSEL]: I don't think the Court's going to allow me to --

---

[20] The trial court was mistaken. As the colloquy set forth *ante* shows, the prosecutor was talking to Lukens, who had been allowed to remain in the courtroom after the court excused the jury.

"[THE COURT]:  No, I'm not.

"[DEFENSE COUNSEL]:  -- but I think I need to make a record of where I was going on how I understood the Court's ruling.

"[THE COURT]:  All right.

"[DEFENSE COUNSEL]:  The Court tells [the prosecutor], you need to be really careful where you go with these witnesses, because this could open this up to cross-examination.

"[THE COURT]:  Right.

"[DEFENSE COUNSEL]:  With this witness, Mr. Lukens, he's already gone there.  He has said, I don't plan on prosecuting you, and by saying, well, [defense counsel], you don't get to cross-examine on that unless [the prosecutor] brings it up, he'll never bring it up.  It's never going to be in his interests to say, oh, and I -- and I promised not to prosecute you.  It just makes his case look worse.  Of course, I'm only going to be the one --

"[THE COURT]:  You took an issue that I took outside the presence of the jury and ran with it.  I brought it up because I'm the judge and I have to look out for everybody's interests.  It was something that I took [the prosecutor] at his word about, and I could -- I could tell from the discussions that I had with everybody present that it had never entered [the prosecutor's] mind.

"[DEFENSE COUNSEL]:  Right.

"[THE COURT]:  And it never had entered the witness' mind.  He made some proffers to me which I believed as an officer of the Court, and that was done.

"So, your implication that he, you know, he's sneakily behind the scenes never going to bring up the discussion that we had outside the presence of the jury that I brought up, you're pulling and tugging on that and you've just expanded it well beyond what it was.

62

"Now, I'm going to let you finish, but I want to be able to characterize your discussion further if you're off the mark.

"[DEFENSE COUNSEL]:  Well --

"[THE COURT]:  You took it in wrongly I think, and --

"[DEFENSE COUNSEL]:  Maybe I -- maybe we were talking past each other, because my initial observation was, I'm very uncomfortable with the prosecutor currying favor with this witness, and I thought the Court then said, yeah, if you go down that road with other witnesses --

"[THE COURT]:  If you go down that road.

"[DEFENSE COUNSEL]:  And he's already gone down that road with Mr. Lukens.  He's curried favor with -- Mr. Lukens now has a reason to testify for him.  He said, I'm not going to prosecute you.

"[THE PROSECUTOR]:  I was very careful with what I said on the record with Mr. Lukens, and *what I said was, based on the testimony he's previously given at the preliminary hearing, I don't anticipate it's going to be an issue*.

"[THE COURT]:  Right.  I recall the conversation relatively well.  It wasn't that long ago.  It was just very short conversation, because it was apparent to me after we started that we were going to have to -- this was just a -- a precautionary issue by me brought up and eliminated within several minutes, because I -- I sent the jury away 20 minutes to 12:00.  We were done within five.  So anything further?"  (Italics added.)

The court then brought the jury back into the courtroom.  The court directed the jurors:  "I want to direct you to the last comments that [defense counsel] was making.  He had just asked a question.  I broke in.  You're ordered to completely disregard that.  Do not think of it in any way."

## B.  Defendant's Contentions

Defendant asserts that the trial court erred in excluding evidence that was offered to prove that Lukens had a motive to conform his testimony to the prosecution's theory of

the case.  According to defendant, "[b]y assuring Lukens that he would not be prosecuted as long as he testified that he signed the declaration unwittingly, as the prosecution theorized, the prosecutor gave Lukens a powerful, self-serving incentive to conform his testimony to the prosecutor's theory that [defendant] was to blame for tricking him into signing a false declaration that he did not read."  Defendant asserts that "[m]issing from the arrangement was any requirement that Lukens tell the truth."  Defendant asserts that the trial court's ruling, preventing him from cross-examining Lukens about whether the prosecutor promised Lukens that he would not face prosecution, violated defendant's Sixth Amendment right to confront and cross-examine Lukens concerning his motive for testifying in favor of the prosecution.  Defendant further asserts that, by directing the jury to disregard defense counsel's question to Lukens about a promise not to prosecute him and prohibiting the defense from raising the topic further, defendant was denied his right to confront Lukens "in a manner that would inform the jury that Lukens had a self-serving motive to conform his testimony to the prosecutor's theory of the case."

We agree that the trial court erred, but the error was harmless beyond a reasonable doubt.

### C.  Rights to a Fair Trial and to Cross-Examine Witnesses[21]

We agree with defendant that the trial court should have avoided conducting the discussion with the prosecutor and defense counsel in Lukens's presence.  Had Lukens been excused from the courtroom, he would never have heard the prosecutor's thoughts on the matter and defendant would have no argument that Lukens' testimony was coerced

---

[21]  The People assert that defendant forfeited this contention by failing to object "to Lukens testifying on this or any basis, but rather only objected to the court's decision not to allow the defense to cross-examine Lukens regarding Lukens['s] asserted agreement with the prosecution."  We disagree.  We find defense counsel's objections on the ground that the prosecutor was "currying favor with the witness, saying I would never prosecute you, this kind of thing . . . ," was sufficient to preserve the issue for appellate review.

or made favorable to the prosecution because of the prosecutor's statements to him. Under the circumstances that unfolded, defendant was entitled to cross-examine Lukens about the prosecutor's statements, addressed directly to Lukens, which included, "I would never seek that charge against *you* based on what I've heard in court, because I don't believe *you* had knowledge of the falsehood." (Italics added.) Defendant was entitled to attempt to show that Lukens had a motive to testify in conformity with the prosecution's theory that he did not knowingly make a false statement, consistent with the prosecutor's statement to Lukens.

"[T]he Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses." (*People v. Lopez* (2012) 55 Cal.4th 569, 576.) "The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841-842.) "[A]n accused has a confrontational right to expose a witness' bias or motive to lie. Promises, *expectations, or hopes* of leniency from the authorities, however unreasonable, may supply such a motive." (*People v. Balderas* (1985) 41 Cal.3d 144, 193, italics added.)

In *Davis v. Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347], the defendant was prevented from introducing evidence that a "crucial" prosecution witness was on probation. The purpose of this line of questioning was to establish a possible bias or motive to testify favorably for the prosecution out of fear of possible probation revocation. (*Id.* at pp. 310-311.) The high court concluded that the trial court erred by not allowing the testimony. (*Id.* at pp. 315-318.) The court reasoned that an appropriate way to attack a witness's credibility is "by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness," and noted that "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." (*Id.* at p. 316.) The witness's probationary status was admissible "to afford a basis for an inference of undue pressure

65

because of [the witness's] vulnerable status as a probationer." (*Id.* at pp. 317-318; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673 [89 L.Ed.2d 674] (*Van Arsdall*) [defendant's right to cross-examine violated by trial court precluding the defense from asking the witness about the fact that criminal charges were dropped in exchange for talking to the prosecutor about a murder].)

In a case where the trial court precluded evidence that criminal charges were pending against a prosecution witness, the Court of Appeal stated, "the pendency of criminal charges is material to a witness' motivation in testifying even where no express 'promises of leniency or immunity' have been made. During trial, defense counsel 'is permitted to inquire whether charges are pending against a witness as a circumstance tending to show that the witness may be seeking leniency through testifying. [Citations.]' [Citation.] . . . [*I*]*t is the witness' subjective expectations*, not the objective bounds of prosecutorial influence, that are determinative: 'Impeachment by showing improper motive depends on the witness' state of mind; the actual power of the authorities to aid or harm him is not conclusive.' " (*People v. Coyer* (1983) 142 Cal.App.3d 839, 842-843, italics added.)

Here, while there were no charges pending against Lukens, the prosecutor assured him there would be no charges because he did not knowingly sign a false declaration. Based on the colloquy, during which the prosecutor spoke directly to Lukens, the defendant was entitled to establish Lukens could have subjectively understood that he was not subject to prosecution provided his testimony remained consistent with that which he had offered to that point. By cutting off all questioning about an event that the jury might reasonably have found gave Lukens a motive for favoring the prosecution in his testimony, the trial court's ruling violated defendant's right to cross-examine, a right guaranteed under the confrontation clause. (See *Van Arsdall, supra*, 475 U.S. at p. 679.) However, as we next discuss, the error was harmless beyond a reasonable doubt.

## D.  Prejudice

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (*Chapman*).)  " ' "Confrontation clause violations are subject to federal harmless-error analysis under" ' " *Chapman*.  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*); *People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*).)  Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*Geier*, at p. 608.)  "The harmless error inquiry asks:  'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid.*; *Livingston*, at p. 1159.)  To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility ' ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), citing *People v. Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).)

Defendant asserts that, because the record does not establish which declaration the jurors relied on in reaching the verdict, the record cannot demonstrate, beyond a reasonable doubt, that the verdict was not based on Lukens's declaration.  Defendant asserts that a conviction based on the Lukens declaration was entirely dependent on Lukens's testimony, and the trial court's error affected the jury's impression of Lukens's testimony.  We disagree and conclude the error was harmless beyond a reasonable doubt.

Lukens, Ala, Kirk, and Arnold all testified that the statements in their declarations that no one was with Kobe circulating the recall petition were false.  Lukens testified that he told defendant that Kobe was not alone.  Ala testified that there were two people circulating the petition "and [defendant] knew it" because, before Ala signed her

67

declaration, she discussed that with defendant. Kirk testified that she told defendant that there was someone else with Kobe when Kobe approached Kirk. As for the declaration of Nelson, who did not testify at trial, Morgan testified that she and Kobe went to Nelson's home together, and that Morgan had circulated the petition. Marks, Nelson's caretaker, testified that two people came to Nelson's house with a petition to recall defendant.

Lukens testified that the statement in his declaration that he declined to sign the recall petition was false; he signed the petition, and he told defendant that he signed the petition. Nelson's was the only other declaration containing the representation that the declarant declined to sign the recall petition. Marks testified that she "helped [Nelson] sign their petition," although she did not offer testimony as to whether she or Nelson told defendant that Nelson signed the petition. Moreover, defendant's own declaration states that she saw "Kobe assisting Nelson in signing the document." Thus, the representation in the declaration defendant furnished for Nelson that he declined to sign the recall petition was contradicted by defendant's own declaration.

The declarations completed by the other three declarants, Ala, Kirk, and Arnold, all stated that the declarants signed the petition on the basis that Kobe represented that the petition was not for the recall of defendant. Ala, Kirk, and Arnold each testified not only that this was a false statement, but that they did not tell defendant that they were misled about the nature of the recall petition.

Thus, other than testifying that the statement in his declaration that he knew Kobe was a member of the Gateway School Board was false, Lukens's testimony was cumulative of the testimony of the other witnesses and of the evidence presented at trial. As stated *ante*, each false statement in each declaration individually or coupled with the testimony of each declarant (or in Nelson's case, with defendant's declaration and Marks's testimony), was legally sufficient to sustain defendant's conviction. The jury was instructed on the unanimity requirement so that it necessarily agreed on at least one

false statement,[22] and there is no evidence to suggest that the jurors would not have agreed on the false statements in the other declarations if they had not heard testimony about Lukens's declaration. Taken in the context of the prosecution's case, Lukens's testimony did not furnish anything unique to the case.

Moreover, as the People point out on appeal, before this issue arose, and specifically before the prosecutor offered any opinion on whether Lukens could potentially incriminate himself with his testimony, Lukens had already testified that three people, including Kobe, came to his house circulating the recall petition; that the statement in the declaration that no one was with Kobe circulating the petition was false; that he signed the petition; that it was actually the woman with Kobe who handed Lukens the petition and asked him to sign it; that the statement in the declaration that he declined to sign the petition was false; that, contrary to the statement in his declaration, he did not know that Kobe was a member of the Gateway School Board; that he did not read the entire declaration before signing it, and that he "just went off of [defendant's] word, what she told me." Thus, almost all of the testimony from Lukens that could have contributed to a guilty verdict was elicited prior to when the prosecutor told Lukens he did not anticipate prosecuting him. And the testimony of the other declarants – similar in all material respects – corroborated and thereby enhanced the credibility of Lukens's testimony.

We conclude that the trial court's error in refusing to allow defense counsel to cross-examine Lukens about the prosecutor's statement, Lukens's understanding of the statement, and whether Lukens had bias or motive in testifying based on his exposure to

_____

[22] In pertinent part, the jury was instructed: "You may not find the defendant guilty unless all of you agree that the People have proved that the defendant prepared at least one false statement to be used in evidence and you all agree on which particular false statement the defendant prepared and used."

criminal prosecution was harmless beyond a reasonable doubt.  Based on our review of the entire record, we conclude beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error  (See generally *Livingston, supra*, 53 Cal.4th at p. 1159; *Geier, supra*, 41 Cal.4th at p. 608), and there is no reasonable possibility that the error contributed to the verdict.  (See generally *Reese, supra*, 2 Cal.5th at p. 671; *Aranda, supra*, 55 Cal.4th at p. 367.)

## IV.  Instructional Error Contention - Book, Paper, Record, Instrument in Writing, or Other Matter or Thing

### A.  Additional Background and Defendant's Contentions

The trial court instructed the jury, in part, "The defendant is charged with falsifying documents to be used in evidence in violation of . . . section 134.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant prepared a *document or written instrument*;  [¶]  2.  The *document or written instrument* was false;  [¶]  3.  The defendant knew the *document or written instrument* was false;  [¶]  4.  The defendant willfully prepared the document or allowed the document to be prepared, intending that it be . . . used at trial or other court proceedings;  [¶]  5.  When the defendant prepared the *document or written instrument,* or allowed it to be prepared, she intended to defraud."[23]  The court further instructed that "[a] '*document or written instrument*' includes a declaration of a person."  (Italics added.)

---

[23]  There is no CALCRIM instruction for section 134, so the court gave this special instruction.  The jury was provided a written copy of the jury instructions.  We note, however, when the trial court read the instructions, the court misread element number three, or it was misreported by the court reporter.  The reporter's transcript reads:  "three, the defendant *through* the document or written instrument was false."  (Italics added.)  " 'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' "  (*People v. Mills* (2010) 48 Cal.4th 158, 201.)  Because the jury was given the correctly worded instruction in written form and because, on appeal, we give precedence to the written instructions (*ibid.*), we disregard this trivial error, not raised by any party, as inconsequential.

70

Defendant now asserts that, because a "document" does not necessarily qualify as a "book, paper, record, instrument in writing, or other matter or thing," the trial court's instruction, stating that the People had to prove only that defendant prepared a document or written instrument, misstated an essential element of the crime. Defendant again employs the doctrine of *ejusdem generis* and asserts that the trial court rewrote the statute to make it applicable to any false document. Defendant further asserts that the court's instruction that a document or written instrument includes the declaration of a person was also erroneous. Defendant again asserts that a declaration of a person is not, as a matter of law, a "book, paper, record, instrument in writing, or other matter or thing," within the meaning of section 134. Defendant also reprises his argument that all of the listed items in section 134 describe real evidence rather than testimonial evidence.

## B. Forfeiture

"Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court. [Citations.] The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights. [Citations.] ' "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." ' " (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 (*Franco*), citing § 1259, *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 & *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

At the conference on jury instructions, defense counsel raised certain objections to the trial court's special instruction. However, no objection to the portions of the instruction italicized above was made. Defendant also did not object on the grounds asserted in several of the other instructional claims she makes on appeal. Citing section 1259, defendant asserts that the assertedly erroneous instructions implicated her

71

substantial rights because they were not correct on the law. Accordingly, we proceed to address the merits of each of defendant's instructional error contentions. (§ 1259; *Franco, supra*, 180 Cal.App.4th at p. 719.)

### C. Standard of Review

"We review de novo whether a jury instruction correctly states the law. [Citations.] Our task is to determine whether the trial court ' "fully and fairly instructed on the applicable law. [Citation.]" ' [Citation.] . . . We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citations.] We assume that the jurors are ' " 'intelligent persons and capable of understanding and correlating all jury instructions . . . given.' " ' [Citation.] If reasonably possible, we will interpret the instructions to support the judgment rather than to defeat it. [Citation.] Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*Franco, supra*, 180 Cal.App.4th at p. 720.)

### D. Analysis

In part I.C.1. of the Discussion, *ante*, we concluded that any "paper" or "other matter or thing" could include the declarations at issue here. Thus, the instruction given by the trial court using the word document and explaining that a document includes the declaration of a person was not erroneous.

### V. Instructional Error Contention - Actus Reus
### A. Additional Background

Defendant takes issue with the following language in the special instruction: "allowed the document to be prepared." Specifically as part of the special instruction, the trial court instructed the jury, in pertinent part: "To prove that the defendant is guilty . . . , the People must prove that: [¶] . . . [¶] 4. The defendant willfully prepared the document *or allowed the document to be prepared* intending that it be used at trial or other court proceedings; [¶] 5. When the defendant prepared the document or written

72

instrument *or allowed it to be prepared*, she intended to defraud. [¶] The defendant is responsible for actions she specifically requested her lawyer to do. The defendant is not responsible . . . for actions she did not specifically request her lawyer to do. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. [¶] . . . [¶] A person intends to defraud if he or she intends to deceive another person, either to cause a loss of something of value or to cause damage or to prevent or thwart . . . a legal right . . . . [¶] If the defendant actually believed that the declarations were true, the defendant is not guilty of this crime, even if the defendant's belief was mistaken."

### B. Defendant's Contentions

Defendant asserts that the trial court gave conflicting instructions in the special instruction regarding the actus reus of the offense. Defendant emphasizes that one portion of the instruction told the jury that it had to find that defendant prepared the document or written instrument, while in other portions of the instruction, the trial court told the jury that it had to find that defendant prepared the document *or allowed it to be prepared*. Defendant asserts that section 134 is not violated by someone allowing another to prepare a false document.

### C. Analysis

We agree with defendant that section 134 proscribes preparing false evidence, and that it does not proscribe passively *allowing* a third party to do so.[24] We conclude, however, it is not reasonably likely that the jury misconstrued or misapplied the instruction in the manner asserted by defendant.

" 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.] When a defendant claims an instruction was subject to erroneous interpretation by the jury, he [or she] must

---

[24] However, as a general matter, a defendant may be guilty of violating section 134 as an aider and abettor and/or a coconspirator.

demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted. [Citation.] In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926 (*Covarrubias*).)

In addition to the language about which defendant complains, the trial court instructed the jury, that "*defendant is responsible for actions she specifically requested her lawyer to do. The defendant is not responsible . . . for actions she did not specifically request her lawyer to do*." (Italics added.) The trial court also instructed the jury that "[a] person intends to defraud if he or she intends to deceive another person, either to cause a loss of something of value or to cause damage or to prevent or thwart . . . a legal right . . . . [¶] If the defendant actually believed that the declarations were true, the defendant is not guilty of this crime, even if the defendant's belief was mistaken."

The trial court also instructed the jury with CALCRIM No. 225 that the prosecution was required to prove that defendant "not only . . . did the acts charged, but also that she acted with a particular intent." It also instructed the jury with CALCRIM No. 251 that "[t]he crime charged in this case requires proof of the union or joint operation of act and wrongful intent. For you to find a person guilty of the crime in this case of falsifying documents to be used in evidence, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The specific intent required for the crime of preparing false documentary evidence is the intent to produce it as genuine or true upon any trial proceeding or inquiry."

The first enumerated element in the special instruction required that, to find defendant guilty, the jury had to find, beyond a reasonable doubt, that she *prepared* false evidence. The special instructions also specified that defendant was responsible for only those actions of her lawyer that "she specifically requested her lawyer to do."

74

Based on the instructions as a whole, we conclude that there is not a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted by defendant. (*Covarrubias, supra*, 1 Cal.5th at p. 926.)

### D. Prejudice

Even if the trial court erred in instructing the jury in a way that conveyed to the jury that defendant could violate section 134 by merely allowing another person to prepare a false document, we conclude that such error was harmless beyond a reasonable doubt. "An instruction that . . . misdescribes an element of an offense is harmless . . . if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 774 (*Mayfield*), overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *People v. Newby* (2008) 167 Cal.App.4th 1341, 1348.)

We may "consider the arguments of [trial] counsel in assessing the probable impact of the instruction[s] on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) The prosecutor in his closing argument stated to the jury that the prosecution had to prove that any given declaration "contains false information," that "defendant knew it contained false information," and that "*defendant participated in the preparation of that document* . . . ." (Italics added.) The prosecutor continued: "If she had nothing to do with that document, even if it contained false information, even if she knew about it, she didn't commit a crime. *She has to participate in the preparation of the document*." (Italics added.) The prosecutor never argued defendant could be convicted if she merely allowed the declarations to be prepared.

"*Chapman* harmless error analysis for instructional error typically includes review of the strength of the prosecution's case." (*People v. Aranda* (2012) 55 Cal.4th 342, 367.) As we have noted, the evidence established that defendant participated in the preparation of the declarations. And it is clear, there would be no declarations without her participation in their preparation.

Based on the instructions as a whole, the evidence concerning defendant's active participation in the preparation of the declarations, as well as the arguments of counsel, we conclude, beyond a reasonable doubt, that the alleged instructional error did not contribute to the verdict. We conclude, beyond a reasonable doubt, that the instructional error would not have misled a reasonable jury. Thus, the error was harmless beyond a reasonable doubt.

## VI. Instructional Error Contention - Union or Joint Operation of Act and Specific Intent

### A. Additional Background and Defendant's Contentions

At the jury instruction conference, the trial court stated that it intended to instruct the jury with a modified version of CALCRIM No. 251. Thereafter, the trial court instructed the jury with CALCRIM No. 251 as set forth in part V.C. of the Discussion, *ante*.

Defendant asserts that the "allowed to be prepared" language in the special instruction eliminated the requirement of the union or joint operation of act and specific intent. According to defendant, that language permitted the jury to conclude that defendant formed the specific intent to defraud, "not while committing the criminal act (preparation of the document) herself, but while allowing another person to prepare it." Thus, as defendant asserts, if defendant "formed an intent to defraud only while passively allowing someone else to prepare false evidence, there would be no union or joint operation of criminal act and specific intent." Defendant asserts that the instructions "gave the jury alternative acts by which [defendant] could have violated . . . section 134, by either preparing the false document itself or allowing others the [*sic*] prepare it. Thus, applying the joint operation of act and specific intent instruction, the jury could have based a conviction on a theory that [defendant] formed the intend [*sic*] to defraud, not while committing the criminal act herself, but while 'allowing' someone else to commit the criminal act."

76

## B. Analysis

Section 20 provides: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." " 'As a general rule, no crime is committed unless there is a union of act and either wrongful intent or criminal negligence.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)

As set forth in part V.C. of the Discussion, *ante*, separate from the special instruction on the elements of a violation of section 134, the trial court instructed the jury with CALCRIM No. 251 on the union or joint operation of act and wrongful intent. We concluded in part V. of the Discussion, *ante*, that the trial court's instructions to the jury were not erroneous despite the fact that the special instruction twice referred to "allow[ing]" a document to be prepared. Moreover, defendant does not contend that the trial court's CALCRIM No. 251 instruction was erroneous in and of itself.

Because we concluded in part V. that there is not a reasonable likelihood that the jury misconstrued or misapplied the instructions given by the trial court such that the jury could find defendant guilty based on merely allowing a third party to prepare false evidence, for the same reasons, we conclude that defendant's contention concerning the union or joint operation of act and specific intent is without merit. The instructions as a whole required that the jury had to find in the first enumerated element that she prepared false evidence. The instructions also informed the jury that, to be guilty of violating section 134, she must have intended the evidence to be used at trial or in other court proceedings, and that she intended to defraud. The instructions informed the jury that defendant could not be responsible for actions she did not specifically request her lawyer to do. The trial court instructed the jury with CALCRIM No. 225 that the People were required to prove that defendant "not only . . . did . . . the acts charged, but also that she acted with a particular intent." The trial court's CALCRIM No. 251 instruction correctly informed the jurors concerning the requirement of "the union or joint operation of act and wrongful intent" and that, for the jury to find defendant guilty, defendant "must not only

77

intentionally commit the prohibited act, but must do so with a specific intent. [¶] The specific intent required for the crime of preparing false documentary evidence is the intent to produce it as genuine or true upon any trial, proceeding or inquiry."

Synthesizing these instructions, and considering the instructions as a whole, we conclude that there is not a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted by defendant so as to allow her to be convicted based on her forming the requisite intent while merely, passively, allowing a third party to prepare false evidence. (See generally *Covarrubias, supra*, 1 Cal.5th at p. 926.)

Moreover, even if the instruction was erroneous, based on the instructions as a whole, the evidence concerning defendant's active participation in the preparation of the declarations, as well as the arguments of counsel, we conclude, beyond a reasonable doubt, that the alleged instructional error did not contribute to the verdict and was thus harmless. (*Chapman*, *supra*, 386 U.S. at p. 24: *Mayfield*, *supra*, 14 Cal.4th at p. 774.)

## VII.  Instruction on "Materiality"

### A.  Additional Background

Defendant objected to the part of the special instruction on the charged crime which told the jurors that the prosecution did not have to prove that defendant knew that the information in her statement was material.[25]  Defense counsel asserted that, insofar as *Bamberg, supra*, 175 Cal.App.4th 618, expanded the scope of section 134, it did so provided that the falsity was material.[26]  The prosecutor relied on the text of section 134

---

[25]  As noted in the unpublished portion of this opinion, there is no CALCRIM instruction for section 134.

[26]  *Bamberg* does not stand for this proposition.  Indeed, the *Bamberg* court does not mention the word "materiality" in the opinion and only uses the word "material" to describe the matter presented as false, as in the purpose of section 134 "is 'to prevent the fraudulent introduction of *material* in a proceeding . . . .' " (*Bamberg*, *supra*, 175 Cal.App.4th at p. 629, italics added.)

and relevant case law, and the absence of any legislative indication of a materiality requirement.  Defense counsel noted that, notwithstanding whatever jury instructions the court might prepare for the case, he had elected to proceed based on a defense that any falsehoods in the declarations were not material, thus suggesting that the elimination of that requirement would be prejudicial to the defense.  The trial court stated that it did not know why defense counsel had the impression materiality would be included in the final instructions.  It agreed with the prosecutor that section 134 contains no materiality requirement and therefore it would not include materiality in its special instruction explaining the charged crime.  The court reasoned that the statute prohibits the perpetration of a fraud upon the court and the significance of the fraud is "not the focal point of the statute."

## B.  Defendant's Contentions

Defendant asserts that materiality is an element of section 134, and therefore the trial court erred in denying her request for an instruction on materiality, and, in doing so, violated her federal due process rights.  Defendant maintains that an element of materiality is implied in section 134 by the requirement of a "fraudulent or deceitful purpose," because materiality is a component of both fraud and deceit.  According to defendant, "fraud" at common law included a materiality element, and that meaning must be incorporated into section 134.  Defendant further asserts that, if "section 134 is to be exp[a]nded to include false statements in witness declarations executed under penalty of perjury, that expansion should also include the recognition of materiality as an element."  Defendant also asserts that the absence of a materiality requirement would give rise to First Amendment concerns because such an application of section 134 would curtail free expression in an overbroad manner.

79

## C. Analysis

### 1. Statutory Language

Defendant acknowledges that, unlike the perjury statute (§ 118), section 134 does not expressly contain a materiality requirement. She further acknowledges that there is no case that has held that materiality is an element of section 134.

Defendant has not established that there was any legislative intent to require materiality as an element of section 134. "It is the state Legislature's province to define the elements of and determine the appropriate penalties for state crimes. [Citation.] ' "The judiciary ordinarily has no power to insert in a statute an element the Legislature has omitted [citation]" [citation] . . . . [Citation.] As the California Supreme Court has repeatedly observed, ' " ' "the power to define crimes and fix penalties is vested exclusively in the legislative branch." [Citations.]' " [Citation.] The courts may not *expand* the Legislature's definition of a crime [citation], nor may they *narrow* a clear and specific definition.' " (*People v. Sy* (2014) 223 Cal.App.4th 44, 61-62 (*Sy*); accord *People v. Moretto* (1994) 21 Cal.App.4th 1269, 1278 ["it is the task of the Legislature, and not the courts, to define crimes and thus to fix their elements. As the California Supreme Court has explained, reviewing courts do not sit as a superlegislature with the power to judicially add or subtract elements of offenses"].)

### 2. The Common Law Understanding of "Fraud" and "Deceit"

Defendant relies on the premise that, "[s]ince early common law, materiality has been considered an 'essential element' of the crime of perjury." (*People v. Kobrin* (1995) 11 Cal.4th 416, 419 (*Kobrin*).) Materiality is indeed an essential element of the crime of perjury; it expressly appears in the statute. (See fn.10, *ante*.) However, section 134 does not contain any such requirement.

In *Laws, supra*, 120 Cal.App.3d 1022, the case involving the receipt for restitution payment a crime victim was duped into signing, the defendant was convicted both under section 134 for preparing false evidence and under section 118 for perjury. (*Laws*, at p.

1026.) The *Laws* court discussed the fact that, "[u]nder the common law, and under statutory declarations of the common law, in order to constitute perjury, it was necessary that the facts stated be material . . . ." (*Id*. at p. 1032.) However, we note that in discussing the conviction under section 134, the *Laws* court did not discuss materiality. (*Laws*, at pp. 1028-1031.)

In asserting that a " 'criminal fraud' occurs when someone is 'materially influenced,' " defendant relies on a depublished case.[27] Moreover, that discussion concerned theft on the theory of false pretenses and the requirement of the victim's reliance on false representations, an element not required by section 134. Likewise, a published case quoted by the depublished case on which defendant relies addresses a theft conviction on the theory of false pretenses, states the elements, including the requirement of the victim's transfer of property to the defendant in reliance on a false representation, and states, " '*[i]n this context*, reliance means that the false representation "materially influenced" the owner's decision to part with his property; it need not be the sole factor motivating the transfer.' " (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1440-1441, quoting *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842-1843, italics added.) These cases do not stand for the proposition that every crime or action involving "fraudulent or deceitful purpose" (§ 134) contains a materiality element.

Similarly unavailing is defendant's reliance on cases discussing materiality in the context of civil intent to defraud. " 'The well-established common law elements of fraud which give rise to the tort action for deceit are: (1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the

---

[27] *People v. Doolittle* (2014) 229 Cal.App.4th 589, depublished upon granting of rehearing pursuant to California Rules of Court, former rule 8.1105(e)(1). The petition for rehearing was granted on October 8, 2014.

misrepresentation; and (5) resulting damage. [Citations.] . . . It is essential . . . that the person complaining of fraud actually have relied on the alleged fraud, and suffered damages as a result.' " (*Bower v. AT&T Mobility, LLC* (2011) 196 Cal.App.4th 1545, 1557.) Again, reliance is an element of civil fraud, so naturally materiality would be required. Not only does section 134 not have a materiality element, but there is also no requirement that the court or any person actually rely on the false information. Nor has defendant demonstrated that the Legislature intended that the California criminal law, and specifically the requirements to establish a violation of section 134, be coextensive with civil fraud. (See *Sy, supra*, 223 Cal.App.4th at p. 61 [the defendants "have not demonstrated the Legislature intended to include these requirements in the statute or that the Legislature was obliged to make California criminal law coextensive with federal law or California civil law in this area"].)

As part of his argument that materiality was understood to be an element of fraud at common law, and therefore it would have been an element of section 134 upon its adoption in 1872, defendant relies on *Neder v. United States* (1999) 527 U.S. 1 [144 L.Ed.2d 35]. In *Neder*, the high court considered whether materiality was an element of the federal mail fraud, wire fraud, and bank fraud statutes based on the language addressing a " 'scheme or artifice to defraud.' " (*Id.* at p. 20.) In determining that those statutes indeed included materiality as an element, the high court stated: "the common law could not have conceived of 'fraud' without proof of materiality." (*Id.* at p. 22.) The high court continued: "Thus, under the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses, we cannot infer from the absence of an express reference to materiality that Congress intended to drop that element from the fraud statutes. On the contrary, we must *presume* that Congress intended to incorporate materiality ' "unless the statute otherwise dictates." ' " (*Id.* at p. 23, fn. omitted.) However, the *Neder* court was addressing statutory construction of federal statutes, which is not controlling of the construction of California's criminal statutes.

82

Moreover, section 134, adopted in 1872, cannot be said to be based on the later-enacted federal statutes at issue in *Neder*.[28]  (See *People v. Soto* (1998) 64 Cal.App.4th 966, 987 [decisions of federal courts are not controlling on matters of state law, but they may be particularly compelling where a California statute is based on a federal statute]; *People v. $8,921 United States Currency* (1994) 28 Cal.App.4th 1226, 1232, fn. 6 ["California courts are not bound by federal decisions, including those of the United States Supreme Court on nonfederal questions, but such decisions are instructive and entitled to great weight, particularly if a state's statute is derived from a federal statute"].)  And defendant "ha[s] not demonstrated the . . . Legislature was obliged to make California criminal law coextensive with federal law . . . in this area." (*Sy, supra*, 223 Cal.App.4th at p. 61.)

Indeed, the Legislature's inclusion of materiality in section 118, addressing perjury, undermines defendant's argument.  As stated *ante*, "[s]ince early common law, materiality has been considered an 'essential element' of the crime of perjury." (*Kobrin, supra*, 11 Cal.4th at p. 419.)  Yet the Legislature expressly included materiality in the statutory language of section 118 in its enactment in 1872.  (§ 118, as enacted by Pen. Code of 1872 [including the "any material matter" language].)  The Legislature's inclusion of materiality in section 118 demonstrates that it knew how to include materiality -- a common law element -- when it wished to do so.  Yet the Legislature did not include materiality in section 134, also enacted in 1872.

As we have noted, the purpose of section 134 is "to prohibit *attempts* to perpetrate fraud in a legal proceeding by preparing evidence with the intent to mislead or deceive the trier of fact." (*Bamberg*, *supra*, 175 Cal.App.4th at p. 629, italics added.)  We agree

---

[28]  The statutes addressed in *Nader* were United States Code title 18 sections 1341 (addressing mail fraud, added in 1948, based on former 18 U.S.C. § 338 [Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130]), 1343 (addressing wire fraud, added in 1952), and 1344 (addressing bank fraud, added in 1984).

with the trial court that the focus of the statute is not the significance of the fraud; rather the statute addresses attempts to perpetrate a fraud in a trial, proceeding or inquiry authorized by law no matter whether the fraud turns out to be material or not.

### 3. The First Amendment

For the first time, defendant raises a First Amendment argument, asserting that if section 134 is to be applied as it has been here, in the absence of a materiality requirement, free expression will be curtailed in a constitutionally impermissible, overbroad manner.  We disagree.

Defendant relies on *United States v. Alvarez* (2012) 567 U.S. 709 [183 L.Ed.2d 574] (*Alvarez*), in which the high court held that the Stolen Valor Act of 2005, which imposed penalties for making false claims about receiving military decorations or medals, violated the First Amendment.  (*Alvarez*, at p. 730.)  Defendant emphasizes language of the plurality stating that the high court "has never endorsed the categorical rule . . . that false statements receive no First Amendment protection," and that "falsity alone may not suffice to bring the speech outside the First Amendment." (*Id.* at p. 719.)  Defendant also relies on the plurality's discussion of perjury as a regulation on false speech that the courts have generally found to be permissible.  (*Id.* at p. 720.)  The plurality noted:  "It is not simply because perjured statements are false that they lack First Amendment protection.  Perjured testimony 'is at war with justice' because it can cause a court to render a 'judgment not resting on truth.'  [Citation.]  Perjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system.  [Citation.]  Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others.  Sworn testimony is quite distinct from lies not spoken under oath and simply intended to puff up oneself." (*Id.* at pp. 720-721.)

We find defendant's First Amendment argument based on *Alvarez* unavailing. As the People assert, section 134 does not criminalize speech that is merely false. It criminalizes the falsification of evidence to be offered in "any trial, proceeding, or inquiry whatever, authorized by law . . . ." (§ 134.) In this respect, the speech regulated by section 134 is like that addressed by the perjury statutes in that it " 'is at war with justice' because it can cause a court to render a 'judgment not resting on truth,' " and it "undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system." (*Alvarez, supra*, 567 U.S. at pp. 720-721.)

Defendant makes the argument that she was prosecuted under section 134 in a content-based manner, and asserts that materiality must be required to ensure that speech is not curtailed in violation of the First Amendment. However, section 134 does not restrict speech based on its content or viewpoint. Rather, it prohibits persons from preparing false information with the intent to produce or allow it to be produced in an official proceeding for a fraudulent or deceitful purpose.

We disagree with defendant that section 134 works a First Amendment violation or that materiality must be an element to prove a violation of section 134 in order to avoid constitutionally impermissible overbreadth.

### 4. Conclusion

We conclude that the trial court did not err in denying defendant's request to instruct the jury on materiality.

### VIII. Defendant's Proposed Special Instructions

The defense requested that the jury be instructed with a special instruction stating, "A document is only false within the meaning of . . . section 134 if it depicts something other than what the defendant claims it depicts." Defense counsel also requested that the jury be instructed with a special instruction stating, "A document is not false within the meaning of . . . section 134 if it has not been altered and has an independent legal effect."

85

The defense relied on *Bamberg, supra*, 175 Cal.App.4th 618. The trial court declined to give both of these instructions, ruling that they were inapplicable and confusing.

In addition to instructing the jury with its own special instruction on the elements of section 134, the trial court instructed the jury with CALCRIM No. 200, stating, in part, "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

Defendant asserts that, in the trial court's instructions on the elements of the charged offense, the word "false" was susceptible to two meanings: "A 'false document' could mean a document that is not genuine or authentic in the sense that it is not what it is claimed to be. A 'false' document could also mean a document containing false information." Defendant argued in the trial court that only the former definition of false should result in a conviction under section 134.

Defendant asserts on appeal that section 134 employs the term false only to mean that the subject document is a fake or not genuine, and not to mean that the document contains false information. According to defendant, the instructions could have misled the jury to believe that a document containing untrue testimony would qualify as a false document within the meaning of section 134. She asserts that, had the jury been properly instructed, it would have realized that prosecution under section 134 under the circumstances of this case was untenable.

We have previously addressed the issue of falsity. The declarations here were false within the meaning of section 134. Just as the DMV RDF in *Bhasin, supra*, 176 Cal.App.4th 461, and the restitution receipt in *Laws, supra*, 120 Cal.App.3d 1022, were false evidence under section 134 because they contained false information, so too were the declarations in this case. We conclude that the trial court did not err in denying the defense's requests for the special instructions or in declining to instruct the jury on defendant's meaning of the term "false."

## IX. Accomplice Testimony Instruction

## A. Defendant's Contentions and the Accomplice Testimony Corroboration Rule

Defendant asserts that, because each of the declarants who testified participated in the preparation of their declarations, and signed those declarations under penalty of perjury, there was sufficient evidence for the jury to find that each of those declarants was an accomplice within the meaning of section 1111. However, the trial court was not asked to, and did not sua sponte, instruct the jury regarding the accomplice testimony corroboration rule.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

" ' "[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice," ' the trial court must instruct the jury, sua sponte, to determine whether the witness was an accomplice. [Citation.] If the testimony establishes that the witness was an accomplice as a matter of law, the jury must be so instructed. [Citation.] In either case, the trial court also must instruct the jury, sua sponte, '(1) that the testimony of the accomplice witness is to be viewed with distrust [citations], and (2) that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated . . . .' " (*People v. Zapien* (1993) 4 Cal.4th 929, 982.)

Where a witness is not an accomplice as a matter of law, "[i]n order to establish that an individual is an accomplice, a defendant bears the burden of both producing evidence raising that issue and of proving the accomplice status by a preponderance of

87

the evidence." (*People v. Belton* (1979) 23 Cal.3d 516, 523, fn. omitted (*Belton*); accord *People v. Rangel* (2016) 62 Cal.4th 1192, 1222 (*Rangel*).)

As the People note, "[i]n order to be an accomplice, the witness must be chargeable with the crime as a principal [citation] . . . [Citation.] An aider and abettor is chargeable as a principal, but his [or her] liability as such depends on whether he [or she] promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose. [Citation.] It is not sufficient that he [or she] merely gives assistance with knowledge of the perpetrator's criminal purpose." (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.)

## B. Analysis

### 1. Accomplices as a Matter of Law

We conclude that the testifying declarants were not accomplices as a matter of law. " '[O]nly if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 430.) There was no evidence that the petition signers knew they had signed on to false statements or that they acted with "any fraudulent or deceitful purpose" when they signed their declarations. (§ 134) Thus, it cannot be said that there could be " 'no reasonable dispute as to the facts or the inferences to be drawn from the facts' " relevant to the accomplice status of the testifying declarants. (*Bryant, Smith and Wheeler*, at p. 430.)

### 2. Defendant's Burden of Establishing the Declarants were Accomplices

For the same reasons, defendant did not meet her burden of establishing, by a preponderance of the evidence (*Rangel, supra*, 62 Cal.4th at p. 1222; *Belton, supra*, 23 Cal.3d at p. 523), that the testifying declarants were accomplices. As we have noted, the evidence showed that each of the declarants were duped into signing the declarations. The evidence showed they were unaware of the false information contained therein until it was later called to their attention and they had no intent to act with a fraudulent or

deceitful purpose. Despite her burden, defendant has pointed to no evidence that would support a contrary conclusion.

### 3. Conclusion

We conclude the trial court did not err by not giving accomplice witness instructions.

## X. Probation Conditions

### A. Additional Background and Defendant's Contentions

In sentencing defendant to formal probation, the trial court ordered defendant participate in counseling and that she submit to warrantless searches. Defendant asserted in her original briefing that the search condition and the requirement that she submit to counseling were unreasonable probation conditions and should be struck.

In a motion filed in the trial court on October 24, 2016, defendant moved for early termination of her probation as successfully completed. Defendant asserted that she had "led a legally blameless life, has fulfilled all conditions of probation, and has the support of both the District Attorney and the Probation Department for an early termination of her probation." On November 7, 2016, the trial court granted defendant's motion as unopposed by the prosecution, terminating defendant's probation as successfully completed.

We requested supplemental briefing from the parties on whether defendant's contentions concerning her probation conditions had been rendered moot by the expiration of her probation or otherwise. We also granted the People's motion to augment the record to include transcripts of post-judgment proceedings related to the successful completion of defendant's probation.

We conclude defendant's contentions are moot and we decline to review her contentions.

89

### B. Mootness

" '[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief.' " (*People v. Gonzalez* (2017) 7 Cal.App.5th 370, 380, disapproved on another ground in *People v. DeLeon* (2017) 3 Cal.5th 640, 646.) " '[A]n action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events. A reversal in such a case would be without practical effect, and the appeal will therefore be dismissed.' " (*People v. Herrera* (2006) 136 Cal.App.4th 1191, 1198.) "Thus, courts typically do not decide moot questions since such decisions 'can have no practical effect or cannot provide the parties with effective relief.' " (*Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 Cal.App.4th 1502, 1519.)

The expiration of a probationer's term of probation renders the probationer's challenges to the conditions of probation technically moot. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120, fn. 5 (*Carbajal*) [a defendant's probation had expired, rendering his appeal technically moot]; *People v. Moran* (2016) 1 Cal.5th 398, 408, fn. 8; *In re Erica R.* (2015) 240 Cal.App.4th 907, 911.) Because defendant's probation was terminated early, a determination here striking the challenged probation conditions would have no practical effect. Defendant does not dispute that her contentions have been rendered technically moot by the successful completion of her term of probation.

### C. Review Notwithstanding Mootness

In her supplemental opening brief,[29] defendant asserts that the issues concerning her probation conditions, although technically moot, should still be reviewed for three reasons. We disagree.

---

[29] Defendant did not submit a supplemental reply brief on this issue.

90

### 1. Section 1203.4 Expungement

Defendant first asserts that section 1203.4[30] conditions relief under that section on the fulfillment of the terms of probation and that the allegedly invalid probation conditions "can still come back to haunt a probationer seeking expungement [citation], should the People assert that the condition was unfulfilled during the probationary term." Therefore, according to defendant, the elimination of an unreasonable condition of probation may still have a practical effect, and thus, the question is not moot.

However, with the agreement of the prosecution, the trial court has determined that defendant successfully completed her probation. In other words, she "has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation . . . ." (§ 1203.4., subd. (a)(1).) We decline to consider defendant's contentions on this ground.

### 2. Lasting Stigma of Counseling Condition

Defendant asserts that the counseling condition, and its imposition on the ground that the trial court "believed her to be mentally ill," creates a lasting stigma. Defendant acknowledges that, "[a]lthough the stigma associated with an unwarranted condition of probation requiring involuntary psychological treatment may not be as harsh as the

---

[30] Section 1203.4 provides, in part, that "[i]n any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if he or she is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he or she has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and except as noted below, he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted . . . ." (§ 1203.4, subd. (a)(1).)

91

stigma that results from an involuntary commitment to a mental hospital, it is nevertheless harmful to the probationer's dignity, reputation, and self-esteem in some measure."

We are not persuaded. In our research, we have not found any California case that concludes that there is a lasting stigma attached to a probation condition requiring a probationer to undergo counseling,[31] although there are cases addressing the stigma attached to a finding that an individual is " ' "gravely disabled" as a result of a mental disorder.' " (*Conservatorship of Martha P.* (2004) 117 Cal.App.4th 857, 868, quoting *Kaplan v. Superior Court* (1989) 216 Cal.App.3d 1354, 1360.)

As the People note, the cases on which defendant relies[32] relate to the stigma that can be involved in the "loss of liberty produced by an involuntary commitment . . . ." (*Vitek v. Jones* (1980) 445 U.S. 480, 492 [63 L.Ed.2d 552, 564].) These cases do not demonstrate that a probation condition requiring the probationer to undergo counseling gives rise to a lasting stigma after probation has been terminated early or otherwise successfully completed such that we should weigh in on the validity of the condition after probation has been terminated. Accordingly, we decline to do so.

### 3. Recurring Question of Public Importance

Finally, defendant asserts that, even if the challenged probation conditions are technically moot, this court has the authority to review them under the exception to the mootness doctrine which applies where there is presented a potentially recurring question which is of public interest. Defendant asserts that it appears that the search condition is

---

[31] Conversely, there are numerous cases that discuss diversion into counseling programs as a way to *avoid* the lasting stigma of a criminal conviction or incarceration. (E.g., *People v. Superior Court (On Tai Ho)* (1974) 11 Cal. 3d 59, 61-62.)

[32] *People v. Blackburn* (2015) 61 Cal.4th 1113, 1119; *People v. Hurtado* (2002) 28 Cal.4th 1179; *Conservatorship of Roulet* (1979) 23 Cal.3d 219; *In re Roger S.* (1977) 19 Cal.3d 921; *In re Azzarella* (1989) 207 Cal.App.3d 1240.

92

imposed as a standard condition in every case.  Therefore, defendant asserts that the issue is a matter of public interest which is likely to recur.  Defendant also asserts that her contentions concerning the counseling condition represent an issue of public interest that is likely to recur.

An exception to the mootness doctrine may apply where an issue, although technically moot, "presents a 'potentially recurring question of public importance.' " (*Carbajal, supra*, 10 Cal.4th at p. 1120, fn. 5; accord *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 (*Wendland*) ["We have discretion to decide otherwise moot cases presenting important issues that are capable of repetition yet tend to evade review"]; *In re Erica R., supra*, 240 Cal.App.4th at p. 911; see generally *In re David B.* (2017) 12 Cal.App.5th 633, 653-654 [discussing different articulations of this exception to the mootness doctrine].)  "Application of the public-interest/likelihood-of-repetition exception to the mootness doctrine is discretionary."  (*Save Stanislaus Area Farm Economy v. Board. of Supervisors* (1993) 13 Cal.App.4th 141, 147.)

We are not of the opinion that the counseling condition represents an issue of potentially recurring public importance that will otherwise evade review.  Indeed, defendant does not advance much of an argument to the contrary.  She discusses matters more appropriately addressed to the propriety of imposing the condition in the first place, not whether the matter presents an issue of public interest likely to recur and likely to evade review.  (See generally *Wendland, supra*, 26 Cal.4th at p. 524, fn. 1; *Carbajal, supra*, 10 Cal.4th at p. 1120, fn. 5; *In re Erica R., supra*, 240 Cal.App.4th at p. 911; *In re David B., supra*, 12 Cal.App.5th at pp. 653-654.)

Similarly, we are not persuaded that the search condition presents an issue of public importance that is likely to recur and to evade review.  Defendant relies on *In re Erica R., supra*, 240 Cal.App.4th 907.  In that case, the Court of Appeal noted that the juvenile defendant was no longer subject to the search condition at issue—an electronic search condition—because she successfully completed probation.  (*Id*. at p. 911.)  Thus,

her contention concerning the probation condition was rendered moot.  (*Ibid*.)  However, the court stated, "it appears that the juvenile court has made the challenged search condition a standard condition in drug-related cases.  Accordingly, this appeal presents issues that are likely to recur, and we exercise our discretion to reach the merits of Erica's challenge to the electronic search condition."  (*Ibid*.)  Electronic search conditions have, indeed, been a hot topic and our high court recently addressed the issue.  (See *In re Ricardo P.* (2019) 7 Cal.5th 1113.)  We decline to exercise our discretion to consider defendant's contentions concerning the search condition here.

First, defendant has not demonstrated that the trial court imposes the search condition as "a standard condition" in all cases.  (*In re Erica R., supra*, 240 Cal.App.4th at p. 911.)  She merely represented that she challenged "what *appears to be* the routine imposition of a search condition as a 'standard condition' in every case . . . ."  (Italics added.)  It is true that a prosecutor, who was "a new practitioner in this court,"  stated, "I also inquired about [the search condition] for uniformity in sentencing and was informed that's a standard term."  However, it is not clear of whom the prosecutor "inquired," who represented that it was a "standard term," and whether that representation had any basis in fact.  Further, defendant has not demonstrated that the trial court actually does impose the search condition as a standard condition.

Second, we cannot say this issue is likely to evade review.  (See *Wendland, supra*, 26 Cal.4th at p. 524, fn. 1.)  Defendant asserts that the routine imposition of a search condition in every case, requiring the probationer to submit to a search of his or her person and all property, merely to ensure that the probationer "obey all laws" (see *People v. Balestra* (1999) 76 Cal.App.4th 57, 67; see also *People v. Olguin* (2008) 45 Cal.4th 375, 381-382) is not sufficiently tailored given the constitutional concerns.  If defendant's contention relates to tailoring, then the contention is one that is necessarily fact specific and would vary from one case to the next.

Defendant also raises the issue of the broadness of search conditions and the fact that they may encompass everything the probationer owns, including electronic devices containing tremendous amounts of personal information.  However, this issue, too, is not one likely to evade review.  (See *Wendland, supra*, 26 Cal.4th at p. 524, fn. 1.)  And in large measure, the issue has been resolved.  (See *In re Ricardo P.*, *supra*, 7 Cal.5th  1113.)

We decline to exercise our discretion to review defendant's moot contentions.

**DISPOSITION**

The judgment is affirmed.

/s/
MURRAY, J.

We concur:

/s/
RAYE, P. J.

/s/
HULL, J.